Ellsworth T. SIMPSON, et al., Appellants,

v.

Robert E. LEE, Appellee.

No. 84–1575.

District of Columbia Court of Appeals.

Argued July 17, 1985.

Decided Oct. 24, 1985.

Louis P. Robbins, Washington, D.C., for appellants.

Mark London, Washington, D.C., with whom Robert F. Condon, Washington, D.C., was on brief, for appellee.

Before NEBEKER, BELSON, and ROGERS, Associate Judges.

ROGERS, Associate Judge:

Appellants, owners of certain real property in the District of Columbia, appeal the grant of a preliminary injunction prohibiting them or their agents from leasing or otherwise occupying that property while litigation is pending regarding appellee's rights as subleasee of the property. They assign as error the motions judge's findings that appellee had a substantial likelihood of prevailing on the merits and would suffer irreparable harm. Their principal contention is that *Mendes v. Johnson*, 389 A.2d 781 (D.C.1978) (en banc), is inapplicable to commercial property when the tenant has abandoned the premises and the lease provides for a right of reentry by the les-

sor upon default in payment of rent. We affirm.

## I

Appellants own the premises at Rear 1073 Wisconsin Avenue, N.W., located on Blues Alley.[1] On November 1, 1980, appellant E.T. Simpson (Simpson) and his brother entered into a lease of those premises with Karamat Moaveni.[2] Mr. Moaveni intended to use the premises for a restaurant, but when he failed to comply with the lease, Simpson entered and repossessed the premises in April 1982. Prior to doing so, he wrote Mr. Moaveni on April 13, 1982 and April 21, 1982, indicating reliance on his voluntary surrender of the premises without the necessity of legal proceedings.

On June 29, 1982, Simpson, as agent for the other owners, entered into a twenty year lease for the same premises with Joanne Filomena Chiacchieri (Ms. Chiacchieri).[3] Ms. Chiacchieri also intended to use the premises as a restaurant and the lease required that she expend at least $120,000 to renovate the premises, which consisted only of a shell of a building. The lease included a warranty for quiet enjoyment and gave the lessor a right of entry and repossession, without notice, for the failure to pay rent for forty days after the due date. Ms. Chiacchieri also executed a document in which she acknowledged receiving notice of possible litigation concerning the premises which she intended to lease

from Simpson and waived any claim for damages that might arise if she was "compelled by judicial process" to release possession as a result of that litigation; the acknowledgement and waiver stated that it would apply to subleasees and assigns. On September 1, 1982, Ms. Chiacchieri, with Simpson's approval, subleased the premises for 19 years, ten months to appellee so that he could open a restaurant. The terms of the sublease were identical to those in the prime lease.

Shortly after appellee's sublease was executed,[4] a confrontation occurred at the premises in late September 1982 between Mr. Moaveni and one of appellee's employees.[5] According to appellee, Mr. Moaveni had broken into the building and changed the locks. Appellee, or one of his employees, called the police to have Mr. Moaveni forcibly removed; the police called Simpson to verify whether Mr. Moaveni was unlawfully on the premises. Following various efforts by Mr. Moaveni to continue in possession, Simpson and his brother filed suit for possession on October 7, 1982; the suit was later voluntarily dismissed and shortly thereafter, on December 13, 1983, Mr. Moaveni filed suit for specific performance of his lease. When Simpson refused to post a bond or give other consideration relating to Mr. Moaveni's claim to the premises, appellee stopped paying rent and refused to proceed with renovation plans.

1. Two codefendants below, Robert Lee Simpson and Edith S. Carlisle, argued in favor of the preliminary injunction, and did not submit a brief to this court.

2. At the time the Moaveni lease was entered, E.T. Simpson and his brother held the property in trust for their father. When the father died on January 17, 1982, the six children became co-owners as tenants in common. Mr. Moaveni's alleged breach occurred prior to the father's death.

3. Ms. Chiacchieri actually signed two leases. She cancelled her original June 29, 1982, lease on August 17, 1982, in order to allow Simpson to negotiate with Mr. Moaveni for repossession of the premises. Three days later she executed a substitute lease after Simpson's negotiations with Mr. Moaveni broke down. Other than

increasing the rental, the substitute lease was identical to the original lease.

4. In his deposition appellee testified that the sublease was executed on September 15, 1982, but effective September 1, 1982.

5. Appellee claimed that this is when he first became aware of Mr. Moaveni's claim that he had a valid prior lease for the premises. In his deposition, Simpson stated that he told appellee about Mr. Moaveni's lease on August 20, 1982, prior to appellee's signing of the sublease. On the same day, appellee gave him a $3000 check for a month's rent and told him to hold it until he checked the legal situation regarding Mr. Moaveni with his lawyer.

On April 12, 1983, Simpson notified Ms. Chiacchieri by certified mail that because of the nonpayment of rent, he intended to re-enter and repossess the premises on June 1, 1983. A copy of the letter was sent to appellee's attorney, who responded on April 14, 1983, that appellee was in Florida on business and a copy of the letter had been sent to his office. Upon receiving no further reply to his letter to Ms. Chiacchieri, Simpson entered and repossessed the property on June 14, 1983; he changed the locks and posted the premises for trespassers. The next day he notified Ms. Chiacchieri of his action by letter, with a copy to appellee in care of his attorney. About one month later, appellee, through new counsel, contacted Simpson's attorney and subsequently wrote two letters, on August 3 and 11, 1983, the latter expressing surprise that the locks had been changed and that appellee was being denied entry to the premises.

Appellee filed suit for possession against appellants [6] and Mr. Moaveni on December 19, 1983, six days after Mr. Moaveni had filed a suit for specific performance of his lease. On July 27, 1984, he filed a motion for a preliminary injunction after learning on July 25, 1984, that Simpson intended to lease the premises to a third party.[7]

## II

■ The decision to grant or deny preliminary injunctive relief is committed to the sound discretion of the trial court. *In re Antioch University*, 418 A.2d 105, 109 (D.C.1980); *Don't Tear It Down, Inc. v.* *District of Columbia*, 395 A.2d 388, 390 (D.C.1978). Before granting a preliminary injunction, the trial court must be satisfied that the moving party has demonstrated that (1) there is a substantial likelihood he will prevail on the merits; (2) he is in danger of suffering irreparable harm during the pendency of the action; and (3) more harm will result to him from the denial of the injunction than to the nonmovant from its grant. *Don't Tear It Down, Inc. v. District of Columbia, supra*, 395 A.2d at 390; *Wisconsin Avenue Associates v. 2720 Wisconsin Avenue Coop.*, 385 A.2d 20, 23 (D.C.1978); *Wieck v. Sterenbuch*, 350 A.2d 384, 387 (D.C.1976). Our role on review of the trial court's action is limited. We do not resolve the merits of the underlying dispute between the litigants, *A Quaker Action Group v. Hickel*, 137 U.S. App.D.C. 176, 180, 421 F.2d 1111, 1115 (1969); *Wieck v. Sterenbuch, supra*, 350 A.2d at 387, but "(1) examin[e] the trial court's findings and conclusions to see if they are sufficiently supported by the record; (2) assur[e] that the trial court's analysis reflects a resolution of all the issues which necessarily underlie the issuance of an injunction; and (3) inquir[e] into any other claims of an abuse of discretion by the trial court." *Wisconsin Avenue Associates, supra*, 385 A.2d at 23 (footnote omitted); *Wieck v. Sterenbuch, supra*, 350 A.2d at 387. Although the trial court is required by Super.Ct.Civ.R. 52(a) and R. 65(d),[8] to make specific findings of fact and conclusions of law, we have held

---

**6.** Ms. Chiacchieri was a defendant below.

**7.** Appellants agreed not to take any action for ten days, which eliminated the need for appellee to seek a temporary restraining order.

**8.** Super.Ct.Civ.R. 52(a) provides in relevant part:
 (a) Effect. Unless expressly waived by all parties, the court shall state findings of fact specially and state separately its conclusions of law in every action tried upon the facts without a jury.... In granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its actions.... Such findings of fact and conclusions of law may be in writing or may be

stated orally in open court if recorded stenographically or by other means approved by the court and shall be sufficient if they state the controlling factual and legal grounds of decision.
Super.Ct.Civ.R. 65(d) provides in relevant part:
 (d) Form And Scope Of Injunction Or Restraining Order. Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained[.]

that the trial court is not required to make findings where there is no factual dispute, *Don't Tear It Down, supra,* 395 A.2d at 391 (citations omitted), and this court will uphold its ruling if its decision is clearly supported by the record. *See id; Wisconsin Avenue Associates, supra,* 385 A.2d at 23 (no written findings but ample record, reasoning of court revealed in transcript, and many facts uncontroverted sufficient to affirm trial court's ruling); *cf. Stamenich v. Markovic,* 462 A.2d 452, 457 (D.C. 1983) (trial court reversed where no findings of fact or conclusions of law made regarding irreparable injury but only one conclusion ascertainable from record).

██ The motions judge heard argument on the motion for a preliminary injunction on October 25, 1984, issued the injunction from the bench, and required appellee to post a $30,000 bond. In concluding that there was a likelihood that appellee would prevail on the merits and suffer irreparable injury if appellants were allowed to lease the property to another party, the judge found that "a lease [e]ntered into now with [a] third party for the same occupancy of that space would be total confusion, [sic] and obviously [appellee] would be irreparably injured because he would have no way of recouping any interest that he may have in the property." Although no other findings were made, a sufficient record exists for appellate review since we can discern the basis of the order and the facts underlying the order are uncontested or are sufficiently supported by the record.

### A.

██ Appellants contend that appellee is unlikely to succeed on the merits because the rule of *Mendes v. Johnson, supra,* 389 A.2d 781, that a landlord does not have the right to self-help, is inapplicable to commercial property which has been abandoned by the tenant. Arguing that the statutory remedies, D.C.Code § 16-1501 and § 45-1410 (1981), are premised on a tenant's refusal to relinquish the premises and are therefore irrelevant, they distinguish *Mendes v. Johnson* on the grounds that it did not involve commercial or unoccupied property, a written lease, or timely notice of an intent to reenter without subsequent objection by the tenant. They also contend that appellants acted lawfully in reentering the premises because a lease provision allowed such entry upon a default for non-payment of rent. They suggest that *Mendes v. Johnson* left open the question whether the parties by agreement may authorize a right of reentry. Appellee responds that the motions judge did not abuse his discretion since appellants are required under *Mendes v. Johnson* to proceed in accordance with § 16-1501. He maintains that he did not abandon the premises or breach his sublease; instead he contends that appellants' action in locking out the original tenant without judicial process resulted in the breach of appellee's right to quiet enjoyment which made it impossible to fulfill his obligations under the sublease.

In *Mendes v. Johnson, supra,* 389 A.2d at 787, this court, sitting en banc, abrogated the landlord's common law right of self-help and held that the legislatively created remedies for reacquiring possession are exclusive. The court held that Congress had, by necessary implication, abolished the common-law right of self-help when it provided a statutory summary procedure. *Id.* at 786 (citing D.C.Code §§ 16-1124, 16-1501 and 45-910). Although *Mendes v. Johnson* involved a residential tenancy, the court, by specifically overruling *Snitman v. Goodman,* 118 A.2d 394 (D.C.1955), made clear that the rationale for its decision is equally applicable to commercial tenancies, and *Mendes v. Johnson* has been so construed. *See Davis v. Gulf Oil Corp.,* 485 A.2d 160, 173 (D.C.1984).

The instant case illustrates the need in a commercial tenancy for the procedural safeguards provided by statute and embraced by the court in *Mendes v. Johnson.* Interest and desire for commercial properties, particularly those in prime locations, as here, are sufficiently keen to result in

violence when self-help is permitted. Several parties view themselves as having a legal right to lease the premises at issue, and the types of problems occurred here which *Mendes v. Johnson* concluded the statutory procedures were designed to avoid. *See id.* at 786. Although Simpson gave prior written notice of his intent to reenter and at least initially met with no opposition, the original tenant persisted in asserting his lease rights, twice entering the property, according to appellee, and changing the locks after appellee's sublease was in effect. Appellee, according to his attorney's letter of August 11, 1983, was surprised Simpson had subsequently denied him access to the premises. Regardless of whether appellee was surprised, he was uncertain whether he could proceed, in accordance with the terms of his sublease, to renovate the premises without jeopardizing his investment. When the original tenant continued to assert rights to the premises, the police had to be summoned to assure orderly resolution of the immediate crisis, and appellee's right to quiet enjoyment remained uncertain. Yet the potential for violence and the uncertainty regarding legal entitlement to the premises could have been avoided by use of summary proceedings of D.C.Code § 16–1501 for obtaining possession in the absence of an abandonment. *Id.* at 786.

 The record does not support appellants' contention that appellee had abandoned the premises. An abandonment occurs when a tenant leaves the premises vacant with the avowed intention not to be bound by his lease. *See, e.g., Cohen v. Food Town, Inc.,* 207 A.2d 122 (D.C.1965). *See also Ten Braak v. Waffle Shops, Inc.,* 542 F.2d 919 (4th Cir.1976); *Kassan v. Stout,* 9 Cal.3d 39, 43, 106 Cal.Rptr. 783,

785, 507 P.2d 87, 89 (1973) (en banc); *Dardis v. Madere,* 433 So.2d 322 (La.1983). Appellee had been in the restaurant business in the District of Columbia for twenty years, and was operating a restaurant in the District when he negotiated the sublease with Simpson and Ms. Chiacchieri in August 1982. He had been looking for another site in the District of Columbia, but stopped after he had reached agreement on subleasing the premises at issue. He paid $18,500 to Ms. Chiacchieri for her interests in the premises and also paid Simpson $9000 in rent. He began plans for the renovation of the premises as a bar-restaurant, contacting a general contractor, engineer, architect and designer, and allegedly incurred expenses as a result.[9] He also formed a corporation and applied for a liquor license. In addition, appellee had on-going discussions with Simpson about how to resolve the Moaveni matter; for example, he urged Simpson to file suit for possession against Mr. Moaveni and, for that purpose, introduced Simpson to his attorney. He also proposed revisions in his sublease to protect himself against Mr. Moaveni's claims. At one point he even offered to buy the premises. Significantly, Simpson's attorney's letter of August 29, 1983, acknowledged that it was agreed, during a meeting with Simpson, appellee and appellee's counsel, that appellee would not renovate the premises until the Moaveni matter was settled, either judicially or otherwise.[10]

Nor, under the circumstances, did appellants justifiably rely on appellee's silence after receiving the April 12, 1983, letter as evidence of his abandonment. It is not entirely clear when appellee received a copy of the letter to Ms. Chiacchieri; he

9. Appellee claimed that he had incurred expenses of between $34,000–$40,000 as the result of his use of a general contractor, engineer, architect, designer, and attorney, as well as other costs. Appellee's working telephone line was also in service at the premises when Simpson reentered the property. Also, contrary to appellants' assertion in their brief in this court, Simpson's attorney's letters of June 15, 1983, and

August 29, 1983, suggest that appellee may have personal property on the premises.

10. Although the letter does not specify the date of this meeting, Simpson testified in his deposition that such a meeting occurred with appellee and his attorney on October 7, 1982.

may have been in Florida at the time.[11] In any event, Simpson was fully aware of appellee's continuing intent to open a restaurant at the premises notwithstanding Mr. Moaveni's claims. He also knew that Ms. Chiacchieri had turned over her interests in the premises when she subleased to appellee. Thus, her silence in response to the April letter is hardly conclusive evidence of appellee's abandonment, particularly in view of Simpson's direct dealings with appellee for almost a year. Nor are appellee's actions comparable to those of the tenant in *Kassan v. Stout, supra,* 9 Cal.3d at 42, 106 Cal.Rptr. at 784, 507 P.2d at 88, who sold his leasehold interest; the court held that the tenant's violation of the terms of the lease did not constitute an abandonment of the premises. *See also Dardis v. Madere, supra,* 433 So.2d at 323 (abandonment found where tenant put sign in window announcing business was closing to reopen in another location). We hold that appellee's actions are inconsistent with abandonment or indifference about who would possess the premises.

■ We further note, in response to appellants' contention that appellee's claim to the premises is solely derivative and must fail in light of Ms. Chiacchieri's acquiescence to Simpson's reentry, that appellee may have an assignment, and not a sublease. *Parks v. Emory,* 68 A.2d 677 (D.C. 1949); THOMPSON ON REAL PROPERTY § 1210 at 48 (1965). Appellee made a lump-sum payment to Ms. Chiacchieri for her interest in the unexpired lease term, and his sublease contains the same terms as the prime lease. The record does not indicate whether Ms. Chiacchieri retained a reversionary interest in the premises. Accordingly, since appellee may have an assignment, we are unpersuaded by appellant's claim, relying on *Rittenberg v. Donohoe Construction Co.,* 426 A.2d 338, 342 (D.C.1981), that the judge erred in granting the injunction because there is a lack of

privity between Simpson and appellee. Further, even assuming without deciding that appellee is bound by Ms. Chiacchieri's acknowledgement and waiver of any claim for damages, that waiver comes into play only after court action vindicating Mr. Moaveni's rights under a prior lease; such action has yet to occur.

■ Appellants contend, nevertheless, that Simpson acted lawfully in entering and repossessing the premises because a provision of the lease (and sublease) authorized him to do so, without prior notice, upon default in the payment of rent. They point out that appellee had advance written notice and failed to respond. Therefore, they argue, the circumstances under which Simpson entered the premises are sufficiently distinguishable from those in *Mendes v. Johnson* to make it inapplicable. In support of their interpretation of the lease provision they rely on *Kassan v. Stout, supra,* 9 Cal.3d 39, 507 P.2d 87, 106 Cal.Rptr. at 783; *Berg v. Wiley,* 264 N.W.2d 145 (Minn.1978); R. FRIEDMAN, II FRIEDMAN ON LEASES, § 18.6, at 978 (2d ed.1983); R. SCHOSHINSKI, AMERICAN LAW OF LANDLORD AND TENANT, § 6:6 (1980); Annot., 6 A.L.R.3d 177, at §§ 5, 7 (1966). We are unpersuaded.

In both *Berg v. Wiley* and *Kassan v. Stout,* the courts rejected the landlord's contention that, in the absence of an abandonment by the tenant, the landlord had the right to re-enter or to terminate the lease upon breach of the lease agreement and was relieved from the responsibility of utilizing the summary statutory procedure for obtaining possession. In *Berg v. Wiley,* the court observed that "[t]o approve this lockout ... merely because in [the tenant's] absence no actual violence erupted while the locks were being changed, would be to encourage all future tenants, in order to protect their possessions, to be vigilant and thereby set the stage for the

---

11. Appellee's attorney had advised Simpson's attorney that appellee was in Florida. Appellee testified in his deposition that he was opening a restaurant in Ft. Lauderdale, Florida, and had sent Simpson a check for $3000 in February, 1983, to show his good faith when he was unable to attend a meeting because he would be in Florida.

very kind of public disturbance which it must be our policy to discourage." 264 N.W.2d at 150. In *Kassan v. Stout,* the court cited with approval its decision in *Jordan v. Talbot,* 55 Cal.2d 597, 604–605, 12 Cal.Rptr. 488, 492, 361 P.2d 20, 24 (1961), (reh'g. denied), holding that a lease provision "expressly permitting a forcible entry would be void as contrary to the public policy set forth in Section 1159 [of the Code of Civil Procedure]." 9 Cal.3d at 43–44; 106 Cal.Rptr. at 785, 507 P.2d at 88. We note that even prior to our decision in *Mendes v. Johnson,* the U.S. Court of Appeals for the District of Columbia Circuit, although upholding a lease clause in *Camalier & Buckley-Madison, Inc. v. Madison Hotel, Inc.,* 168 U.S.App.D.C. 149, 162 n. 93, 513 F.2d 407, 420 n. 93 (1975), decried the "dark-of-night lock-changing method of eviction ... instead of invocation of the processes of law for that purpose." We hold that the right-to-enter provision in the parties' agreement did not relieve appellants of their obligation to comply with the statutory remedies.

### B.

The record supports the motions judge's finding that appellee would suffer irreparable injury if the injunction were not granted. *Don't Tear It Down v. District of Columbia, supra,* 395 A.2d at 390. In support of his motion for a preliminary injunction, appellee alleged, by affidavit, that Simpson was planning to lease the property.[12] Were a third sublease to acquire rights to the premises, appellee's rights would be substantially and adversely affected. If a new tenant made renovations and began doing business, appellee's right to possession would be frustrated. Although money damages are available, they would be difficult to assess precisely because each property tends to have unique characteristics. *Flack v. Laster,* 417 A.2d 393, 400 (D.C.1980). Even if a new tenant renovated the premises for a restaurant, it is unlikely the design would be compatible with that contemplated by appellee.[13] Both appellee and the new tenant would incur additional costs if appellee were to prevail in court. Appellee would also be deprived of his remedy of specific performance. *See City Stores Co. v. Ammerman,* 266 F.Supp. 766, 776 (D.C.1967), aff'd 129 U.S.App.D.C. 325, 394 F.2d 950 (1968). Two lawsuits are already pending, by appellee and by Mr. Moaveni, claiming mutually exclusive rights to possession of the premises, and a third tenant's claims might result in litigation which would further delay appellee's exercise of his rights.

For reasons previously discussed, we are also satisfied that the record reveals sufficient support for the conclusion that more harm would result to appellee if the injunction were denied than to appellants from its grant,[14] and that the public interest will not be disserved by issuance of the injunction. Accordingly, the judgment is affirmed.

*Affirmed.*

---

**12.** At oral argument, Simpson's counsel advised that a third lease had been entered. We note, however, that appellee timely posted the $30,000 bond required by the motions judge and as appellants requested, and the record does not indicate that the preliminary injunction was stayed pending this appeal. Super.Ct.Civ.R. 65(d); D.C.App.R. 8.

**13.** For example, appellee planned to operate a pub/restaurant, while Mr. Moaveni planned to operate a Swedish Smorgasbord.

**14.** That two of the owners of the premises argued in the trial court in favor of the preliminary injunction and opposed further leasing of the property until the underlying litigation is resolved, may not be sufficient to protect appellee's interests. *See Washington Ins. Agency v. Friedlander,* 487 A.2d 599, 602 (D.C.1985). *See supra* note 12.