Nokomis N. HINTON, Appellant,

v.

**SEALANDER BROKERAGE CO., Appellee.**

No. 05–CV–303.

District of Columbia Court of Appeals.

Submitted Dec. 12, 2006.

Decided Feb. 15, 2007.

Nokomis N. Hinton, pro se.

Morris R. Battino, Washington, for appellee.

Before FISHER and THOMPSON, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

This appeal presents an unusual, ostensibly inconsistent combination of circumstances: a landlord's wrongful, self-help eviction, followed by the tenant's holdover as a trespasser on the premises. The pro se tenant, Nokomis Hinton, filed an action in forma pauperis against her landlord, Sealander Brokerage Co., for allegedly locking her out of her single family rental house before she had been able to move out all her furniture and personal belongings.[1] The landlord then filed a counterclaim for unpaid rent attributable to the tenant's holding over by leaving property in the house after she had left. The trial judge ruled for the landlord on both the claim and the counterclaim. We vacate the judgment and remand the case for further proceedings.

## I. Background

The tenant filed her complaint on September 29, 2003, alleging that she had given the landlord a "30 day notice" that she was leaving the premises;[2] that the landlord had changed the locks before her "30 day[s were] up" and that the landlord had denied her access to her "belongings" that remained in the house.[3] She sought $16,000 in damages. The landlord answered, alleging among other things that the tenant had "abandoned the property" (both real and personal) and had no "lawful right" to it. More than eight months later, the landlord received the court's permission to file a counterclaim alleging that "in September 2003," the tenant had become "delinquent in her monthly rent" and owed the landlord "rent in the sum of $6,615.00." Despite two orders from the court to answer the counterclaim, the tenant never formally did so. In her pretrial statement, however, she alleged in response to the "Counterclaim for monies owed" that "no money was due." Thereafter, both the landlord and the trial judge

---

1. The tenancy at 1311 South Capitol St., S.W. was subsidized by the government under the Section 8 Housing Assistance Payments Program. *See* 42 U.S.C. § 1437f (2001). *See also* D.C.Code § 42–2851.06(c) (2001) ("The owner of a housing accommodation shall not refuse to rent a dwelling unit to a person because the person will provide his or her rental payment, in whole or in part, through a section 8 voucher."). Initially, of the tenant's $700 monthly rent, $492 was subsidized by Section 8 Housing Assistance Payments. By the end of the tenancy, however, the tenant was receiving a $700 subsidy covering her entire rent.

2. The lease, initially for a year ending March 31, 1998, converted to a "month-to-month status" at the end of that first year.

3. The tenant's complaint was accompanied by a motion for a temporary restraining order, which was dismissed for want of prosecution because of the tenant's failure to appear at the hearing on the motion.

treated the counterclaim as if issue had been joined. Then, after a bench trial, the trial court ruled for the landlord on both the claim and the counterclaim and awarded money damages against the tenant totaling $7,808.30 (plus statutory interest from March 21, 2005) as compensation for storing the tenant's personal property on the premises for ten months ($7,000) and, thereafter, in a U–Haul storage facility ($808.30).

■ The tenant now appeals, arguing (with the benefit of reasonable inferences from her pleadings) that her "rent was paid in full" through September 2003; that the "lease was over" when she moved out beginning September 3, but that she was entitled to "30 day[s]" within which to remove her furniture and other property; that the landlord had engaged in an "illegal lock out," changing the locks "on September 19[,] 2003" with "half of the appellant's furniture lock[ed] in the house"; that the landlord had "refused" to give a key to the tenant; that the landlord's actions therefore amounted to an "illegal withholding" of the tenant's "furniture and things"; and that "there was no agreement" that the tenant would pay for storage on the premises.[4]

4. The tenant also contends that the landlord committed perjury by lying "about the place of storage." She is referring to the landlord's admitted error in specifying the address of the U–Haul storage facility where the landlord eventually stored the tenant's property. This grievance was not part of the tenant's wrongful eviction claim presented to the trial court and thus has not been preserved for appeal. We decline to address it (other than to note that the correct storage facility was less than one block down the same street from the address given, and that the tenant was not prejudiced in any way by the minor delay in retrieving her belongings caused by the landlord's error). *See Southall v. United States,* 716 A.2d 183, 189 (D.C.1998); *Robinson v.*

## II. Wrongful Eviction

■ "In resolving an appeal from a non-jury trial, we may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." *Crescent Props. v. Inabinet,* 897 A.2d 782, 789–90 (D.C.2006) (internal quotations omitted) (citing *Zoob v. Jordan,* 841 A.2d 761, 764 (D.C.2004)); D.C.Code § 17–305(a) (2001). The trial court's findings of fact will not be disturbed unless they are clearly erroneous, *Crescent Props.,* 897 A.2d at 790, and the evidence will be viewed in the light most favorable to the prevailing party. *Real Estate Escrow, Inc. v. Fitzgerald,* 846 A.2d 289, 290 (D.C. 2004) (citing *Drevenak v. Abendschein,* 773 A.2d 396, 415–16 (D.C.2001)).

■ In order to establish wrongful eviction, a tenant must prove that the landlord performed "some act of a permanent character with the intention and effect of depriving the tenant of the enjoyment of the demised premises or a part thereof." *International Comm'n on English in Liturgy v. Schwartz,* 573 A.2d 1303, 1305 (D.C.1990) (citing *Hughes v. Westchester Dev. Corp.,* 64 App. D.C. 292, 293, 77 F.2d 550, 551 (1935)).[5] "Whether the landlord

*Washington Internal Medicine Assocs., P.C.,* 647 A.2d 1140, 1144–45 (D.C.1994).

5. The cases cited articulate the proof required to establish a constructive eviction. The tenant never clarified whether she was proceeding on an actual eviction or constructive eviction theory. There is, however, no meaningful distinction between the two in the elements of proof that must be demonstrated. Modern cases have indicated that "historically and functionally, the doctrine of constructive eviction is an extension of the doctrine of actual eviction." *Bown v. Hamilton,* 601 A.2d 1074, 1077 n. 9 (D.C.1992) (quoting A. CUNNINGHAM, W. STOEBUCK & D. WHITMAN, THE LAW OF PROPERTY 296 (1984)). An actual eviction is, traditionally, some physical distur-

performed an act with the intent to evict the tenant is a question of fact for the trial court." *Id.*[6] The law is clear in this jurisdiction, moreover, that a landlord is prohibited from using self-help to evict a tenant and must proceed instead by using the process provided by law. *Mendes v. Johnson*, 389 A.2d 781, 783–87 (D.C.1978) (en banc) (landlord's common law right of self-help eviction by removing tenant's belongings from premises abrogated by exclusive statutory remedy mandating reliance on legal process), *abrogated in part by Davis v. Moore*, 772 A.2d 204 (D.C.2001) (en banc). Nothing, however, precludes a landlord from securing a vacant unit to prevent theft and vandalism. *See* 14 DCMR § 6800.3 (2006) ("[T]he owner of a vacant building is required to maintain the building . . . [by ensuring that] [d]oors, windows, areaways, and other openings are . . . secured against entry by . . . trespassers . . .").[7]

The tenant testified at trial that she had paid her rent through September 30; that she had sent the landlord "a notice of 30–day move out . . . on the 3rd of September"; that she had been moving out "constantly" from September 3 to September 20, 2003; that on the 20th she had found the landlord's locksmith "chang[ing] the locks on the door"; and that when she had asked the landlord's representative for a key so that she "could continue to move [her] things[,] . . . [h]e refused."

The landlord's representative told a different story. He acknowledged that the tenant's rent had been paid through September 30, 2003, but said that she had "never notified" him that she was leaving. He further testified that "approximately on the 26th of September" 2003, he learned from a former neighbor of the tenant that the house was vacant and "unsecured"—the "doors were open." He then testified that when he had gone right away to check on the property, "[i]t looked like someone had abandoned it, left it, and that somebody was ransacking." In particular, "[w]indows were broken, doors had been torn off the hinges[;] . . . it looked like someone was trying to, you know, maliciously damage the place." He found that the house still contained "many items" of personal property "in various states of [dis]array." (He took photos of the property inside the house and offered them as exhibits at trial.) He then elaborated:

> I tried to close the door in the back as best I could and close the front door. I was able to lock the front door with a small hand lock but all the other locks had been removed, both on the gate and

---

bance in a tenant's possession by the landlord. *See, e.g., Hyde v. Brandler*, 118 A.2d 398, 400 (D.C.1955) (stating that covenant of quiet enjoyment is "not broken unless there is an eviction from, or some actual disturbance in, the possession by the landlord"); 49 Am Jur.2d *Landlord and Tenant* § 644 (1970) (describing "ancient rule" that "entry and expulsion" was required to prove eviction). "Constructive eviction, like actual eviction, is a violation of the covenant of quiet enjoyment implied in leases." *Bown*, 601 A.2d at 1077 (citing *Weisman v. Middleton*, 390 A.2d 996, 1001 (D.C.1978)).

**6.** The "intention" criterion for a "wrongful" eviction is not a subjective one. The courts of this jurisdiction have said that "the law as-

sumes that the landlord intends the natural and probable consequences of his acts. . . . Generally, whether the acts of the landlord have been done with intent to evict the tenant is a question of fact for the determination of the jury. But the question of actual intent arises only when the acts are such as do not of themselves afford a presumption of intent." *Hughes*, 64 App. D.C. at 293, 77 F.2d at 551 (internal citations and quotations omitted).

**7.** *Cf. Ramsay v. Morrissette*, 252 A.2d 509, 513 (D.C.1969) (suggesting that landlord's duty of reasonable care in urban areas may include taking steps to deter or prevent criminal acts against tenant).

on the main door. The dead bolts had all been removed.

Accordingly, he said, in order to protect the tenant's property as well as the landlord's, he made arrangements with a locksmith "to put locks on the doors" three days later, September 29, 2003. Also on the 29th, the landlord's representative posted a notice on the front door of the house containing a phone number for the tenant to call in order to gain entry for removal of her belongings. The notice added that a "message has been left with your new landlord[;] we have no telephone number for you." The landlord's representative further testified that, on other occasions during the ensuing months, the landlord had informed the tenant that she "could pick up her things at any time."

The tenant contradicted the testimony of the landlord's representative that she had never notified him of her intention to leave, stating that she had told him this perhaps "ten or eleven" times between September 20 and 29. She acknowledged on cross-examination, however, that once he became aware that she was leaving, the landlord's representative had told her that she "could come and immediately remove [her] things," and that she had had multiple opportunities to retrieve what was hers. Nonetheless, she had declined to do so, she said, because the landlord's representative had refused to give her a key. He preferred instead to meet her at the house and open the door for her, a resolution she rejected apparently because of

prior legal proceedings with the landlord which had led the tenant to believe that she was "not supposed to go around him." [8] In giving his reasons for refusing the tenant a key, the landlord's representative testified:

> The building had been ransacked. Doors had been torn off their hinges. Windows had been broken. We weren't sure who did that. We didn't know whether it was [the tenant], we didn't know whether it was neighbors, we didn't know whether it was some vandals cruising the neighborhood. We didn't know. What we did know was that that property was unsecured at the time and that's why we put the locks on.

Implicitly, the landlord's representative was saying that he did not trust the tenant with the key to a house that she had given up and perhaps even trashed herself.

"[B]ased upon the credibility of the witnesses," the trial judge ruled for the landlord in the wrongful eviction action.

> The court accepts the testimony of the [landlord's representative] in that the ... [tenant] seems to focus all of her case on the fact that she was not given a key in order to come in and get the property.

> It's clear from the evidence here and from the [tenant's] own testimony that she had an opportunity to get the property that was in the house, that she either refused or chose not to exercise

---

8. During the tenant's examination of the landlord's representative, the following exchange took place:

> Tenant: Did you understand that I took you to court for a stay-away order? Did you understand that clearly?
> Landlord: Yes.
> Tenant: You understood the TPO clearly?
> Landlord: Yes.

> Tenant: Okay. So why did you feel as though I would want to come to your office and meet you at any time?

It is not clear from the record whether a temporary protective order (TPO) was in effect against either of the parties at any time during the pendency of this case. If it was, that fact would weigh into the trial court's determination of the reasonableness of the conditions for retrieval of the tenant's property. See *infra* note 27.

the ability she had to achieve those—that goal.

██ The landlord's willingness to accommodate the tenant does not end the inquiry, however. The tenant has claimed an "illegal lock out." *See, e.g., Robinson v. Sarisky,* 535 A.2d 901, 904–06 (D.C.1988) (successful wrongful eviction action against tax sale purchaser who repeatedly boarded up property and changed locks despite notification that plaintiff was lawfully living in premises). The landlord admittedly installed new locks on September 26 and 29 and refused to give the tenant a new key, excluding her from freely entering the premises. The tenant, as a result, is claiming that the landlord did so before her lease expired. Further, she claims in effect that the landlord's withholding of the key amounted to a self-help eviction that violated the teaching of our en banc decision in *Mendes, supra,* limiting eviction to legal process.[9] More specifically, three questions underlying the *Mendes* issue are presented here: (1) whether the landlord was entitled to install new locks on the premises without the tenant's participation; (2) if so, whether the landlord installed them (and refused to provide a key) at a time when the lease was still in effect, knowing that the tenant had not abandoned her personal property remaining on the premises; and, if so, (3) whether the lock change, when coupled with the landlord's willingness to open the premises for the tenant to remove her property, was action benign enough to foreclose a *Mendes* violation.

██ As to the first, the evidence indicates that, regardless of whether the tenant gave the landlord a thirty-day notice of intent to vacate, the tenant's rental house had become open, with door locks missing, inviting ransacking by others—which had already occurred. Upon learning of the situation, therefore, the landlord had a right, indeed a responsibility, under 14 DCMR § 6800.3 to secure the premises, based on a reasonable, initial perception that the tenant had abandoned[10] the house and her personal property, perhaps even damaging the premises herself while leaving. The landlord's right is reinforced by the lease itself. According to clause 6, "Tenant will allow the Landlord or his Agent access to the premises at any reasonable time for the purpose of inspection or repair." Because the tenant herself was gone from the premises and had not provided the landlord with a telephone number where she could be reached, it was not unreasonable for the landlord to enter for purposes of repair without the tenant present to grant permission.

9. An additional issue is suggested by the lease itself. Paragraph 12 authorizes the landlord to terminate the lease if "the leased premises shall become vacant during the term hereof or renewal term." To do so, however, the landlord must give the tenant "thirty (30) days notice in writing." Whatever the reach of this option to terminate under the lease, we do not believe that its notice provision trumps the landlord's responsibility under government regulations, 14 DCMR § 6800.3 (2006), to secure vacant property, especially because there is no record basis for concluding that, merely by replacing broken or missing locks under the circumstances here, the landlord was seeking to terminate the tenancy.

10. This court has variously defined "abandonment" as follows: "[T]he term 'abandon' ... require[s] the specific intent to relinquish or give up a right or interest; '[i]t includes the intention, and also the external act by which it is carried into effect.' Hence, 'abandonment' is defined to mean 'vacating property with the intention of not returning.'" *Saul Subsidiary II Ltd. P'ship v. Venator Group Specialty, Inc.,* 830 A.2d 854, 861 (D.C.2003) (citations omitted). And we have also said: "An abandonment occurs when a tenant leaves the premises vacant with the avowed intention not to be bound by his lease." *Simpson v. Lee,* 499 A.2d 889, 894 (D.C.1985).

■ As to the second question, the record reveals that the landlord changed the locks and refused the tenant a key at a time when the lease was still in effect, knowing that the tenant had not abandoned the furniture and other belongings she had left in the house. In the first place, the tenant claimed that her "rent was paid" through September 30 (which the landlord does not dispute), that she had given a "30–day notice to move," and that she had given her notice on "September 3rd." We shall assume for the sake of argument that the tenant gave the landlord a September 3 notice, as claimed. However, we see no basis for a finding that she intended for the lease to run through October 3, a date three days beyond any intention of the tenant to pay rent. Moreover, the tenancy itself, which became month-to-month on April 1, 1998, see *supra* note 2, could end only upon the last day of an ensuing month upon proper notice, *see Dorado v. Loew's, Inc.*, 88 A.2d 188, 190 (D.C.1952), and the record does not permit an inference that the tenant intended October 31, rather than September 30, as the termination date. Accordingly, we must conclude as a matter of law that the tenant claimed the lease to be in effect through September 30—but no later.

■ The landlord, on the other hand—as evidenced by its counterclaim— never intended the lease to expire until the tenant's property had been removed in full from the house. The landlord did not consider the lock change to be an eviction; at most it was seen as a recapture of premises perceived on September 26 to be abandoned. The landlord soon came to realize, however, no later (but not demonstrably earlier) than September 29—the day the tenant filed her wrongful eviction action and motion for temporary restraining order—that the tenant, although vacating the premises, had not abandoned her personal property or her right to enter for the purpose of retrieving that property. See *supra* note 10 (distinguishing "vacating" from "abandoning" the premises). Thus, the landlord understood on September 29 that the house was still occupied, constructively, by the tenant. Accordingly, having accepted rent through September 30 pursuant to the terms of the lease, the landlord is estopped to claim that the tenancy ended any sooner. And, having refused the tenant a key during the brief, two-day period (September 29–30) when the lease was still in effect, the landlord is further estopped to claim that the tenancy extended any later than September 30, the date through which the tenant claimed a right to occupy the premises.[11]

■ We turn to the third, dispositive question under *Mendes:* the legal significance of the change in locks. It does not necessarily follow that the landlord's right to secure the vandalized house under lease to the tenant justified withholding a key

11. D.C.Code § 42–3208 (2001) permits the parties to agree upon shortening or extending the notice period required by the lease, and provides that either party may waive the notice intended for its benefit. Although the statute calls for such agreement or waiver to be "in writing," we have held that under some circumstances a waiver of the notice period may be implied by a party's conduct. *See Sklar v. Hightower,* 342 A.2d 57, 59 (D.C. 1975) (landlord's oral notice to vacate in less than thirty days if tenant refused rent increase, followed by tenant's oral acceptance of notice to vacate, resulted in landlord's waiver of tenant's obligation to give thirty-day written notice of intention to vacate). In the present case, although the landlord could have demanded the full thirty-day notice if it had not locked the tenant out, its conduct in withholding the key is sufficient to imply the landlord's waiver of any notice otherwise required of the tenant. *See id.* In relying on § 42–3208 to permit the landlord's waiver, we imply no approval of that section to justify a tenant's waiver. *See* Rental Housing Act, D.C.Code § 42–3505.01 (2001) (evictions).

for the new locks—a withholding the landlord acknowledges. The tenant's right to a key—to untrammeled entry—reflects a fundamental obligation of the landlord under any standard residential lease.[12] Nonetheless, rather than allow the tenant free rein to haul away her belongings from the premises during the last two days of her tenancy, the landlord insisted on supervising her every entry, despite her having paid full rent through September 30. The landlord thus faced a choice: give the tenant a key or be willing to pay damages for excluding the tenant from the house for two days.[13]

■ ■ ■ We accept the trial judge's findings crediting the landlord's representative's testimony but we must conclude, even so, that the judge erred as a matter of law in ruling that the tenant had not been evicted unlawfully. We are satisfied that, by constraining the tenant's right of entry for the two-day period while the lease was still in effect (September 29–30),

the landlord intended to deprive the tenant of full use of the premises, see *supra* note 6, and exercised a kind of self-help proscribed by *Mendes, supra.* We conclude, accordingly, that the tenant is entitled to damages for that eviction to the extent provable.[14]

### III. Counterclaim

■ ■ ■ We turn to the counterclaim. The landlord seeks recovery of unpaid rent for the period after the tenant moved out but left furniture and other personal property on the premises. As we have noted, by refusing to give the tenant a key to the house after the broken or missing locks had been replaced, the landlord evicted the tenant on September 29 while the lease was still in effect. As of the 29th, therefore, the tenant's obligation to pay rent ended,[15] and she was entitled to damages from the landlord for ousting her before the lease terminated at midnight on September 30.[16] Because she had left proper-

---

**12.** According to the RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT § 6.1 illus. 6 (1977), "[t]he landlord is considered to be in unauthorized possession of the leased property if he fails to provide the tenant with the essential means of taking possession." For example: "On the date T is entitled to possession of the leased premises, he finds the premises unoccupied but all doors are locked and L is unavailable.... L is in unauthorized possession of the leased property." *Id.*

**13.** The tenancy ran through the entire day on September 30. *See Zoby v. Kosmadakes,* 61 A.2d 618, 621 (D.C.1948) ("the midnight dividing the last day of one month and the first day of the next can be only the end of the notice period").

**14.** We have noted that "the law presumes that some damages result from an unlawful eviction. Such damages are not limited to physical injury or property loss. This court long ago accepted the principle 'that a tenant who has been unlawfully evicted may recover for mental suffering, inconvenience and discomfort.'" *Robinson, supra,* 535 A.2d at 905 (quoting *Higgins v. Dail,* 61 A.2d 38, 40 n. 2

(D.C.1948)). That said, "the damages in a particular wrongful eviction case may be 'small *or even nominal* in amount.'" *Henson v. Prue,* 810 A.2d 912, 915 (D.C.2002) (quoting *Higgins,* 61 A.2d at 40).

**15.** RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT § 12.1 cmt. g. ("The obligation of the tenant to pay rent does not arise for any period after the lease is terminated."). *See Bown,* 601 A.2d at 1077 n. 9 ("where the landlord has evicted the tenant[,] ... the tenant [was] permitted to terminate a lease"); *see also* 49 AM.JUR. 2d *Landlord and Tenant* § 84 ("[T]he lessor's failure to perform any of its obligations under the agreement does not justify the lessee's abandonment of his estate and termination of rental payments *except where the lessor's nonperformance results in a constructive eviction.*") (emphasis added).

**16.** See *supra* note 13. The fact that an eviction occurred on September 29, with a corresponding end of the rental obligation, does not mean that all obligations under the lease terminated upon that eviction. By virtue of the landlord-tenant relationship, some cove-

ty in the house, however, she was still potentially liable to the landlord for damages for holding over.

When a landlord terminates a tenancy unlawfully, as in this case, the tenant has an election of remedies. She may either take legal action to reinstate the lease and obtain legal and equitable relief, as appropriate;[17] or, as she did here, take action premised on an end of the lease by suing for damages.[18] If, however, that wrongfully evicted tenant, in seeking damages, nonetheless remains in some way on the premises without acting to reinstate the lease, the landlord—despite evicting unlawfully—will retain the right, through setoff or counterclaim, to recover its own damages[19] for the tenant's continued occupancy beyond the period reasonably necessary for her to remove her property after the landlord abruptly terminated the lease.[20]

With this background in mind, we address the question whether the amount of personal property the tenant left behind was sufficient to generate liability for holding over. That is a question for the trier of fact to answer. *Beck v. Troiano,* 138 A.2d 492, 493 (D.C.1958).[21] We are satisfied—given the testimony and photographs revealing a list of over fifty items of significant value—that the trial judge did not err in finding that the tenant left enough property in the house for holdover liability, at least for the period after a reasonable time for removing her property had expired (an issue the judge did not address).

In ruling on the counterclaim, the trial judge determined that the tenant owed "$700 a month rent for a 10 month period" (October 2003–July 2004, the period the property remained in the house before it was moved to outside storage).

---

nants of the lease extend to future interaction between the parties, regardless of formal termination of the lease. *See, e.g.,* RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT § 14.7, quoted *infra* in text, and *infra* note 31.

**17.** RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT § 6.1; *see, e.g.,* D.C.Code § 42–3505.01 (2001) (providing tenant right to recover possession after unlawful retaliatory eviction).

**18.** RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT § 6.1; *cf. McIntosh v. Gitomer,* 120 A.2d 205, 206 (D.C.1956) ("eviction and re-entry by the landlord terminates the tenancy" and any subsequent liability is deemed "damages").

**19.** *See Habib v. Thurston,* 517 A.2d 1, 13 n. 16, 18 (D.C.1985) ("damages based" on "reasonable value" for "continued use and occupancy of the premises"). Reasonable value is "determined presumptively"—but not conclusively—by reference to "the rent the tenant had been paying." *Id.* (citing RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT § 14.5); *Byrne v. Morrison,* 25 App. D.C. 72,

75 (1905) (damages not automatically determined by "rent stipulated in the expired contract, but [rather by] the reasonable value of the use and occupation, together with damage that may have been done to the property").

**20.** *See* 49 AM.JUR.2D *Landlord and Tenant* § 237 ("[T]he lessee does not forfeit or lose title to his personal property by neglecting to remove it. He has a right to make, within reasonable time after the termination of the tenancy, a reasonable ingress to remove his property."). Although this right of "reasonable ingress" is directed at preserving a tenant's title to personal property, the same rationale applies to preserving the tenant's right of removal when the landlord has precipitously evicted the tenant, in violation of the lease, without leaving the tenant time to accomplish the removal before the tenancy has ended.

**21.** In *Beck,* we noted that a "holding over does not result from the leaving of property which is practically worthless or which is left merely for the convenience of the incoming tenant, nor does it result from the leaving of a small amount of the property on the premises without any intention of retaining or enjoying possession of the premises." 138 A.2d at 493.

Although the presumptive measure of damages, at least for continuous use of the premises, is the rent prescribed for the lease term,[22] the judge erred in failing to come to grips with whether that presumptive value applied to the facts over that entire ten-month period. He characterized the $7,000 he ordered the tenant to pay for storage in the house simply as "rent," as though the lease were continuing, without converting the assessment to a damages analysis. The trial judge instead should have calculated the reasonable value for use of the premises during the tenant's holdover, beginning after the period reasonably required to allow the tenant to remove her property after the landlord's termination of her lease. See *supra* note 20.

The tenant's holding over after September 30 did not give her rights as a statutory "tenant by sufferance"[23] or as a tenant in limbo pending resolution of a dispute with the landlord over, say, alleged overcrowding[24] or housing code violations.[25] Rather, the actions of both parties brought termination of the lease—the landlord by withholding the key, the tenant by rejecting the lease and suing for damages. The question thus becomes: by the choice she made, did the tenant forfeit her right to insist on a key and instead create for herself an obligation to retrieve her property under reasonable conditions proposed by the key-holding landlord?

We conclude that the answer must be yes. In this jurisdiction a holdover tenant, as such, is technically a "wrong-doer,"[26] but she is not necessarily without rights reflected by the lease. According to the RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT § 14.7:

> Subject to the rules [prohibiting a landlord's self-help (unless permitted by statute), and permitting a landlord to impose another term on, or to recover damages (including special damages) from, a holdover tenant], the legal relationships of the landlord and tenant during the period in which the tenant improperly holds over after the termination of the lease are the same as during the period of the lease, *except to the extent a modification of the legal position of one or the other is required by the circumstances of the holding over.* [Emphasis added.]

The authors elaborated in comment e:

> Generally, all the landlord's obligations under the terminated lease, those imposed by agreement as well as by law, continue into the period in which the tenant holds over, *with the exception of duties of action or omission clearly intended to prevail only during the period of the original lease.* [Emphasis added.]

All things considered, we believe that the situation here fits the Restatement exceptions italicized above. A key is not necessary to accomplish the tenant's retrieval of her property—assum-

22. See *supra* note 19.

23. *See* D.C.Code § 42–520 (2001); *Estate of Wells v. Estate of Smith,* 576 A.2d 707, 712 (D.C.1990); *Hampton v. Mott Motors, Inc.,* 32 A.2d 247, 248 (D.C.1943).

24. *See Habib, supra* note 19, 517 A.2d at 4.

25. *See, e.g., Nuyen v. Luna,* 884 A.2d 650, 651–52 (D.C.2005); *Habib, supra* note 19, 517

A.2d at 12–13; *Javins v. First Nat'l Realty Corp.,* 138 U.S.App. D.C. 369, 380–81, 428 F.2d 1071, 1082–83 (1970), *cert. denied,* 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970).

26. *See Zoby, supra* note 13, 61 A.2d at 620 (citing TIFFANY, REAL PROPERTY, 3d ed. §§ 170, 175 (1939)).

ing, as the trial judge's credibility findings require us to do, that the landlord stood ready at all reasonable times to open the house for the tenant to pick up her belongings. Accordingly, we do not perceive any reason why a tenant who repudiates the lease should be entitled to a key, as though the lease were still alive, rather than having to go along with a reasonable proposal[27] by the landlord to facilitate retrieval of her property using the landlord's key. By her actions in holding over with her unremoved personal property, and in repudiating the lease, the tenant has no claim to any kind of tenancy, other than the bare right of entry to retrieve her belongings within a reasonable period of time after the lease was terminated. See *supra* note 20. Aside from that brief period, for which the landlord has agreed to facilitate her retrieval by opening the door, she stands in no stronger relationship to the landlord than a trespasser who, by definition, has no right to a key.[28]

27. In evaluating the landlord's proposal, the trial judge should consider the record evidence of the landlord's insistence that the tenant remove her property, the landlord's offers to make that possible, and the reasonableness of the tenant's responses. Existence of a restraining order against either party, see *supra* note 8, would certainly factor into the reasonableness of the proposed arrangements.

28. For purposes of this case there is no meaningful distinction between characterizing the tenant as a "trespasser" or a "holdover tenant" after termination of the lease. The "reasonable value" measure of damages applies whether one is a holdover tenant, see *Habib*, 517 A.2d at 13 n. 16, 18, or a trespasser. See *Christopher v. Shapiro*, 107 A.2d 117, 118 (D.C.1954). There is, however, this caveat. Although the "reasonable value" formulation is the same for both theories of recovery, situations are conceivable where the distinction may become meaningful. For example, a holdover tenancy usually presupposes continuing occupancy of the entire premises, whereas a trespass can be an episodic use of a

## IV. Damages

■■■■■■ That does not end the analysis, however. By claiming an "illegal withholding" of her property in addition to an "illegal lockout," the tenant can be said to have raised a mitigation defense.[29] (Tenant claiming she informed landlord "[y]ou can't hold my things.") Essentially, the tenant maintains that the landlord could have reduced or eliminated its damages by giving her a key, permitting prompt retrieval of her property from the premises. The focus, therefore, shifts to the landlord's responsibility, if any, to mitigate damages while *standing firm on its right*— which we here sustain—to withhold the key after the lease ended.

■■■■■■ Notwithstanding termination of a lease by a landlord's wrongful eviction, coupled with the tenant's election not to seek reinstatement, the terms of the lease may still govern damages;[30] and, as a

portion of the premises. Accordingly, while the "reasonable rental value is the proper measure of damages" for trespass when there is "continuous use" of the entire premises, *id.*, the damages for trespass may be less when the use is not tantamount to that of a tenant.

29. In landlord and tenant law, mitigation must be raised as an affirmative defense. *See Norris v. Green*, 656 A.2d 282, 287 (D.C.1995). Although the pro se tenant in this case lacked the legal sophistication to phrase it as such, we believe that the most reasonable inference to be drawn from her arguments to the trial court is that the landlord should have mitigated its damages by giving her a key. *Cf. MacLeod v. Georgetown Univ. Med. Ctr.*, 736 A.2d 977, 980 (D.C.1999) (describing appropriateness of giving leeway to pro se litigants in situations involving technical pleadings, especially in cases that are remedial in nature).

30. See *supra* note 16 (CITING RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT § 14.7, quoted in text, *supra* ).

result, the contract principles requiring mitigation may apply.[31] For example, if a landlord specifically reserves the right to re-enter and re-let the premises upon termination of the lease while holding the tenant liable for damages, it is the landlord's "duty to make reasonable efforts to that end and thereby minimize his damages." *McIntosh v. Gitomer*, 120 A.2d 205, 206 (D.C.1956). *See also Lennon, supra* note 31, 287 U.S.App. D.C. at 206, 920 F.2d at 1000 ("Under District law . . . a lease provision giving the re-entering lessor a right to lost rent is construed as creating a right to damages, subject to the mitigation doctrine, i.e., to a requirement that the lessor use "reasonable efforts" to relet."). In this case, clause 12 of the lease provides that after termination of the lease the landlord "may, without notice, re-enter the said premises and remove . . . all contents." However, this lease provision (the validity of which we do not address) is premised on the landlord's *lawful* termination of the lease; literally, it does not apply in the context of an unlawful, self-help eviction.

■ In the absence of contractual provisions in the lease that dictate the respective liabilities of the landlord and tenant after a mutual effort to terminate, as in this case, general principles of property and tort law are available. Here, we have concluded that upon termination of the lease the tenant became a trespasser, entitling the landlord to damages for intrusion upon its property. With no governing contractual provision in the lease, therefore, we may draw on the doctrine of avoidable consequences—the tort formulation for mitigation—for calculation of damages.[32] "The avoidable consequences doctrine is that 'one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort. . . .'" *Flowers v. District of Columbia*, 478 A.2d 1073, 1077 (D.C.1984) (quoting RESTATEMENT (SECOND) OF TORTS § 918 (1979)). Surely, if a landlord must mitigate damages assessable against a holdover tenant when the landlord has terminated the lease lawfully, a landlord also must mitigate damages payable by a holdover—though technically trespassing—tenant

31. Landlord and tenant jurisprudence on mitigation draws on principles of property law and contract law. Some courts have taken the position that a lease is a present transfer of an estate in real property, and thus that the well-established principle of mitigation from contract law does not apply. *See, e.g., Holy Properties Ltd., L.P. v. Kenneth Cole Prods.*, 87 N.Y.2d 130, 133, 637 N.Y.S.2d 964, 661 N.E.2d 694 (1995). On the other hand, in line with the Restatement principle that the "landlord's obligations under the terminated lease . . . continue into the period in which the tenant holds over," except when those obligations are "clearly intended to prevail only during the period of the original lease," RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT § 14.7, cmt. e, the U.S. Court of Appeals for the District of Columbia Circuit has found occasion to confirm that contract principles still can apply after termination of a "leasehold" interest in real property.

In reality, the question of whether a contract "exists" after obligations to perform its covenants end, but a right to damages for breach survives, is highly metaphysical. But it is clear that a contract's provisions can define and provide remedies even after all obligations to perform under the contract have been discharged.

*Lennon v. United States Theatre Corp.*, 287 U.S.App. D.C. 202, 205, 920 F.2d 996, 999 (1990) (citing 5A CORBIN ON CONTRACTS § 1229 at 509 (1964)). Thus, where there are specific post-termination damage provisions in the lease, the parties will continue to be bound by them.

32. *See Foster v. George Washington Univ. Med. Ctr.*, 738 A.2d 791, 795 (D.C.1999) (equating "avoidable consequences doctrine" with mitigation of damages).

when the landlord has terminated the lease unlawfully.

Although we have held that under the circumstances of this case the tenant was not entitled to a key after eviction, the court did not consider the landlord's own responsibility to mitigate damages, for example, by promptly moving the property to an outside storage facility and re-letting the premises, or by confining the tenant's property to an area of the house, such as the basement, that might have permitted attraction of a new tenant.[33] There may, in other words, have been a way for the landlord to have handled the situation less expensively for the tenant than full rent over ten months while the tenant was persisting in her demand for a key. From this record, however, we cannot tell what, if any, reasonable possibilities for mitigation there were.

■ It follows, from the foregoing discussion, that the $7,000 in "rent" awarded on the counterclaim must be revisited in a "damages" analysis. This means that the trial judge will have to allocate responsibility over a ten-month period between a tenant who claimed to want her property but was insisting on a key to get it, and a landlord who refused to give the tenant a key and retained her property in the house, but stood willing to open the house, as needed, to permit removal of that property.

■ The court also awarded $808.30 to the landlord for the costs of eventually moving the tenant's property to the U–Haul storage facility. Such damages are appropriately awardable to the landlord.[34] It is possible, although not at all predictable, that in reevaluating the damages awardable to the landlord for storing the tenant's property at the house, the trial judge may find that the amount of damages awardable for off-site storage should be recalculated—a result that we find permissible but not required.

## V. Conclusion

In sum, we vacate the judgment and remand the case for evaluation of damages payable to the tenant for her wrongful eviction, as well as for reconsideration of damages payable to the landlord for the tenant's holding over on the former rental premises by leaving her property there after her lease had expired. In particular, the trial judge shall consider the responsibility of each party to mitigate damages. We leave it to the judge to determine how much additional testimony and other evidence, if any, will be needed to resolve the matter. In view of the complex issues presented, we hope that the tenant will find counsel on remand. If she cannot afford to pay for a lawyer, we trust that the trial judge will acquaint her with legal services available from the law schools, the

---

**33.** *Cf. Malden Mills Indus. v. Maroun* (*In re Malden Mills Indus.*), 303 B.R. 688, 705 (Bankr.Fed.App.2004) (stating that award of damages for holdover resulting from property left behind is appropriately limited to space actually occupied by tenant's property and not entire building). It is important to note, however, that because the landlord knew that the tenant had not abandoned her belongings left in the house, it could not have sold or destroyed that property even if the tenant were considered no more than a trespasser.

*See* D.C.Code § 16–1501 (forcible entry and detainer) and § 42–3210 (action in ejectment) (2001); *Mendes,* 389 A.2d at 783.

**34.** *Comedy v. Vito,* 492 A.2d 276, 278 (D.C. 1985) ("When chattels left on the property by a former tenant interfere with the landlord's use of the property, the landlord is entitled to recover the cost of removal.") (citing Restatement (Second) of Property: Landlord and Tenant § 12.3 cmt. 1).

organized bar, and other nonprofit organizations.

*Judgment vacated and case remanded.*