*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 12-CV-324 & 12-CV-325

GEORGE S. THANOS, APPELLANT,

V.

DISTRICT OF COLUMBIA, APPELLEE,

AND

12-CV-350 & 12-CV-411

DISTRICT OF COLUMBIA, CROSS-APPELLANT,

V.

GEORGE S. THANOS, CROSS-APPELLEE,

&

VIP THERAPY, INC., ET AL., CROSS-APPELLEES.

Appeals from the Superior Court
of the District of Columbia
(CAB 6897-08 & CAB 856-11)

(Hon. Brook Hedge, Trial Judge)

(Argued January 22, 2014                    Decided December 31, 2014)

*Thomas T. Heslep*, for appellant/cross-appellee.

*Stacy L. Anderson*, Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and

*Donna M. Murasky*, Deputy Solicitor General, were on the brief, for appellee/cross-appellant District of Columbia.

*Nathan Baney* for cross-appellees VIP Therapy, Inc., and Deborah Poindexter. *J. Chapman Peterson* was on the brief for cross-appellees VIP Therapy, Inc., and Deborah Poindexter.

Before BECKWITH and EASTERLY, *Associate Judges*, and BELSON, *Senior Judge*.

BECKWITH, *Associate Judge*:  At the conclusion of a one-day trial, the trial court in this case found that property owned by appellant George Thanos and leased by VIP Therapy, Inc. (VIP), constituted a prostitution-related nuisance pursuant to the Drug or Prostitution-Related Nuisance Abatement Act, D.C. Code § 42-3101 *et seq.* (2012 Repl.).[1]  The court issued a permanent injunction and assessed attorney's fees and costs against Mr. Thanos, VIP, and VIP's owner, Deborah Poindexter, but denied the District's request for income disgorgement and damages.  Mr. Thanos appeals the issuance of the permanent injunction and imposition of attorney's fees and the District cross-appeals the denial of its request for income disgorgement.  For the reasons discussed below, we affirm the court's permanent injunction and attorney's fees rulings and we reverse the trial court's conclusion that it did not have authority to order income disgorgement and remand for further proceedings on that count.

---

[1]  All subsequent D.C. Code citations are to the 2012 Replacement volume.

## I.    Background

Since 1986, George Thanos owned a four-story building on Connecticut Avenue, N.W., and ran a dry-cleaning business out of the first floor of that building.  He rented out the three upper floors to a variety of tenants.  In 2001, a Metropolitan Police Department (MPD) investigation revealed that the fourth floor tenant, Supra Spa, was operating as a prostitution front.  Mr. Thanos met with District government representatives and expressed unwillingness to assist MPD in investigating the alleged prostitution problem in his building, indicating, among other things, that he felt like MPD was asking him to "spy" on his tenants.  The investigation was not pursued any further at that time.  As Detective Mark Gilkey—a supervising manager in the MPD Prostitution Enforcement Unit—later explained at trial, MPD shifted its investigatory focus to "street" prostitution for a period of several years following Mr. Thanos's initial contact with the department.

Seven years later, Mr. Thanos and his fourth floor tenants once again came to MPD's attention when officers made two prostitution-related arrests at that location.[2]  On May 23, 2008, the District obtained a preliminary injunction against Supra Spa precluding it from doing any business on the property until it obtained a

---

[2]  Detective Gilkey testified that, as an undercover detective at the premises on March 4, 2008, he was offered sex for money after a brief conversation with a Supra Spa employee.

certificate of occupancy and a basic business license. In July, MPD made two more prostitution-related arrests at Supra Spa.[3]

The District contacted Mr. Thanos in August 2008 to put him on notice that he once again had a prostitution-related nuisance on the fourth floor of his building. *See* D.C. Code 42-3103 (b). The letter informed Mr. Thanos of his responsibilities under the Drug or Prostitution-Related Nuisance Abatement Act and explained that the District could file suit against Mr. Thanos if he failed to abate the nuisance. *See* D.C. Code 42-3102. Although Mr. Thanos took no action, Supra Spa vacated the premises that August. Because the District had not yet received a reply from Mr. Thanos, the District filed a complaint against him seeking an injunction ordering Mr. Thanos to evict Supra Spa as a tenant. Mr. Thanos sent a letter, dated September 22, 2008, informing the District that Supra Spa had vacated the premises and that the man who was currently leasing the space would be responsible for disposing of any items left behind by Supra Spa. Mr. Thanos later explained at trial that the new tenant, Don Gardner, was sleeping on the fourth floor to protect the premises from former Supra Spa customers who banged on the door at night attempting to gain entry. Mr. Gardner was paying Mr.

---

[3] Ray Melvin of the MPD Prostitution Enforcement Unit testified at trial that he went undercover to Supra Spa on July 24, 2008, and was offered both "sex and oral sex" by a young woman.

Thanos one dollar per month in rent.

On November 28, 2008, Mr. Thanos leased the fourth floor of his building to VIP, another massage provider.[4] VIP opened for business in April 2009. MPD began receiving complaints shortly thereafter from community members and nongovernmental organizations indicating that prostitution was once again occurring on Mr. Thanos's premises. Officers made four more prostitution-related arrests on June 30, 2009, including VIP's owner, Deborah Poindexter.[5]

On July 17, 2009, the court granted the District's motion for leave to amend its complaint against Mr. Thanos to add Ms. Poindexter and VIP as defendants and to incorporate new facts. A trial on the District's request for injunctive relief was set for March 22, 2010. Two more prostitution-related arrests were made on October 28, 2009, while the matter was awaiting trial.

Shortly after the trial but before the judge issued a ruling, MPD Officer Roy Melvin was involved in a June 16 undercover investigation at VIP—then doing

---

[4] The lease specified that VIP was not to use the premises for any unlawful purposes or engage in "sexually oriented activity."

[5] Detective Gilkey testified that when he entered the spa while working undercover, Ms. Poindexter directed him to a room and brought "a girl" to him, "and then there was an agreement with the girl she brought back"—namely, "oral sex for money."

business as "Asian Mist"—that led to the arrest of one person for solicitation and prostitution as well as the recovery of a large salt container filled with approximately 1000 used condoms and a flashlight hiding a stash of new condoms.

While awaiting the court's ruling regarding a permanent injunction, the District again moved for a TRO on October 8, 2010, to stop Mr. Thanos from continuing to rent the property to VIP and for other related relief based on two additional prostitution-related arrests made a month before on the fourth floor of Mr. Thanos's property.[6]  The court granted the District's request on February 9, 2011, and enjoined Mr. Thanos from renting his property to VIP or any other business that involved touching, prohibited VIP from engaging in any business on the premises or elsewhere in the District, and directed Mr. Thanos to change the locks on the building and place a sign on the property indicating that the massage parlor was closed for business.

On March 11, 2011, the court issued its decision from the March 2010 trial concluding that Mr. Thanos's property constituted a prostitution-related nuisance as defined by the Drug or Prostitution-Related Nuisance Abatement Statute, that Mr. Thanos received statutorily sufficient notice of the nuisance, and that he failed

---

[6]  The undercover operation, prompted again by citizen complaints, also led to the seizure of $14,000 in cash.

to abate the nuisance as required by the statute. The court also found that VIP and Ms. Poindexter failed to cease the illegal activities. The court entered a judgment of liability against Mr. Thanos, VIP, and Ms. Poindexter, and ordered that the February 9, 2011, TRO remain in effect pending final determination and entry of an appropriate remedy.

On May 18, 2011, the court held an evidentiary hearing to determine damages and equitable relief. The District sought per diem fines at a rate of $100 per day that VIP leased the unit in Mr. Thanos's building (totaling $82,200), rents and other monies collected by Mr. Thanos from VIP during that period ($122,281), and the gross revenues of VIP's illegal business (which the District approximated at $3,225,600). Finally, the District sought attorney's fees ($76,451.93 from Mr. Thanos and $48,236.93 from VIP) and costs ($3,308.55). The District was represented throughout the proceedings by a so-called "Special Assistant Attorney General," a private attorney acting in pro bono capacity on behalf of the District. On February 10, 2012, the court granted the District's request for attorney's fees and issued a permanent injunction but denied its request for income disgorgement, finding such a remedy unsupported by the statute.

Mr. Thanos appeals the trial court's issuance of the permanent injunction and attorney's fees. The District cross-appeals, arguing that the court abused its

discretion by denying the government's request for disgorgement of Mr. Thanos's and VIP's revenues.

## II. Analysis

The Drug or Prostitution-Related Nuisance Abatement Act gives the District authority—after making a reasonable attempt to notify the owner of the property—to file an action in the Superior Court to abate, enjoin, and prevent a prostitution-related nuisance when the District has reason to believe that such a nuisance exists. D.C. Code § 42-3102. A prostitution-related nuisance is defined as "[a]ny real property, in whole or in part, used or intended to be used to facilitate prostitution . . . that has an adverse impact on the community" or "any real property, in whole or in part, used or intended to be used to facilitate any violation of" various District of Columbia anti-prostitution statutes. D.C. Code § 42-3101 (5)(B)-(C). The statute clarifies that, for the purposes of this Act, "adverse impact" means the presence of at least one of several conditions. Those relevant here include:

> (C) Increased volume of vehicular and pedestrian traffic to and from the property that is related to prostitution[;]

> (G) Investigative . . . actions relating to prostitution by undercover law enforcement officers at or near the property;

(H) Arrests of persons on or near the property for criminal conduct relating to prostitution[; or]

(I) Search warrants served or executed at the property relating to prostitution.

D.C. Code § 42-3101 (1). If the court finds the existence of a prostitution-related nuisance, the Act specifies that it "shall enter an order permanently enjoining, abating, and preventing the continuance or recurrence of the nuisance." D.C. Code § 42-3110 (a). Such an order may include per diem damages for each day the nuisance is unabated after the date the defendant had actual or constructive knowledge of the nuisance, and may also include relief in the form of attorney's fees and costs and "any other remedy which the court, in its discretion, deems appropriate." D.C. Code §§ 42-3110 (b), 42-3111. In fashioning such an order, the court "shall consider, without limitation," several factors, including:

> (1) The extent and duration of the . . . prostitution-related nuisance and the severity of the adverse impact on the community;
>
> (5) The number of times the owner or tenant has been notified of . . . prostitution-related problems at the property;
>
> (6) Prior efforts or lack of efforts by the defendant to abate the drug or prostitution-related nuisance;
>
> (8) The costs incurred by the jurisdiction . . . in investigating, correcting, or attempting to correct the . . . prostitution-related nuisance;

(9) Whether the . . . prostitution-related nuisance was continuous or recurring;

(10) The economic or financial benefit accruing or likely to accrue to the defendant as a result of the conditions constituting the . . . prostitution-related nuisance; or

(11) Any other factor the court deems relevant.

D.C. Code § 42-3110 (c). Although the Act "shall be construed liberally in accordance with its remedial purposes," and "the availability of other remedies under the law or other equitable relief" is not limited, the statute makes clear that "[t]his action is civil in nature and none of its provisions should be interpreted as punishment." D.C. Code §§ 42-3113, 42-3114.

## A. Permanent Injunction

In its order granting the District's request for a permanent injunction, the trial court considered the relevant factors under the Act and noted the "pervasive nature of the activity and defendants' knowledge" as well as Mr. Thanos's "repeated disregard of the law" and "creativity" in flouting it. The court concluded that "wide-ranging injunctive relief is necessary to ensure that the nuisance remains abated" and fashioned a permanent injunction requiring that any lease or sale of the building be preapproved by the District and that Mr. Thanos rent only to businesses that do not involve touching, other than to a licensed physician.

Mr. Thanos argues on appeal that the trial court abused its discretion and committed legal error in issuing the permanent injunction.[7] He contends that the court erroneously granted the permanent injunction because the District possessed "unclean hands" in that it never attempted to revoke the massage therapy license of VIP or any of its employees, owners, or operators. He emphasizes, too, that none of the District's arrests led to any conviction. While the District could have attempted to solve the nuisance through more traditional means, the Act provides the District with an additional tool to combat prostitution. Nothing in the Act requires the District to revoke any licenses or convict anyone for injunctive relief to be proper. The Act specifically provides that "[a] previous conviction of the defendant, or any tenant or owner of the property, shall not be required to demonstrate a . . . prostitution-related nuisance." D.C. Code § 42-3106. Mr. Thanos nonetheless argues that "[u]nder a rational theory of statutory

---

[7] Mr. Thanos also argues that the Temporary Restraining Order was improperly granted, but because the court subsequently entered a permanent injunction against Mr. Thanos, his challenges to the TRO are moot. *See Yates v. District of Columbia*, 868 A.2d 866 (D.C. 2005) (holding that challenges to a preliminary injunction become moot upon the entry of a permanent injunction). Similarly, we find no merit in his contention that the permanent injunction was improper because the trial court failed to hold a hearing on the District's requests for a preliminary injunction within ten business days as required by D.C. Code § 42-3104 (a). Failure to hold a preliminary injunction hearing as required would only affect the propriety of a preliminary injunction, which Mr. Thanos admits was never issued against him.

interpretation," the exclusion of a conviction requirement for the defendant or any tenant or owner of the property "cannot possibly mean that *no one* need be convicted in order to trigger this statute," but rather "[t]he fact that these specific people are excluded, must mean that there *must* be some sort of conviction of *someone*, if arrests are the only evidence of a nuisance." (emphasis in original).

We disagree. When interpreting a statute, our task is "to ascertain and give effect to the legislative intent and to give legislative words their natural meaning." *In re D.R.*, 96 A.3d 45, 49 (D.C. 2014) (citation omitted). Section 42-3106, which is entitled "Conviction not required," states that the District can obtain relief under the Act without first convicting any of the individuals one expects to be involved in a property-based nuisance—defendants (for example, landlords), property owners, or tenants. It is counterintuitive to suggest that this explicit rejection of a conviction requirement for the most likely participants in a nuisance demonstrates that the Council intended to create—but chose not to do so expressly—a contrary requirement that the District must convict another individual who is not likely to be involved in a nuisance.

Mr. Thanos also challenges the entry of the permanent injunction by arguing that, under the facts and circumstances of this case, no "nuisance" with the requisite "adverse impact on the community" can be found. The record contains

ample evidence, however, upon which the trial court could conclude both that a nuisance existed and that it adversely affected the community as defined by D.C. Code § 42-3101.

To find a nuisance under the Act, the court must conclude that the property is "in whole or in part, used, or intended to be used, to facilitate prostitution" and "has an adverse impact on the community." D.C. Code § 42-3101 (5)(B) (2012 Repl.). This standard consists of two separate inquiries. The first inquiry— whether the property is used or intended to be used in whole or in part to facilitate prostitution—is not defined by the statute[8] and is thus interpreted according to its "ordinary meaning." *Hood v. United States*, 28 A.3d 553, 559 (D.C. 2011). Here the record contains considerable evidence that Mr. Thanos's property was at least being "used in part" by VIP for prostitution—the testimony of several undercover officers regularly receiving solicitations for prostitution at the property, coupled with the sizeable stash of both used and new condoms found on the premises, belies Mr. Thanos's argument to the contrary.

The second inquiry is whether the property use has an adverse impact on the community. The Act makes clear that even one enumerated condition is sufficient

---

[8] This inquiry is neither guided nor bound by the factors in § 42-3101 (1), which relate solely to "adverse impact."

to support a finding of adverse impact to the community. D.C. Code § 42-3101 (1) ("'Adverse impact' means the presence of any one or more of the following conditions . . . .").[9] Evidence of several of those conditions appeared in the record, including "[i]nvestigative . . . actions relating to prostitution by undercover law enforcement officers at or near the property," "[a]rrests of persons on or near the property for criminal conduct relating to prostitution," and "[s]earch warrants served or executed at the property relating to prostitution." D.C. Code § 42-3101 (1) (G)-(I). The trial court also noted that Mr. Thanos hired a security guard to watch over the property after the massage business left because "customers were banging on the door in the middle of the night." That finding demonstrates the existence of another enumerated condition—"[i]ncreased volume of vehicular and pedestrian traffic to and from the property that is related to prostitution. . . ." D.C.

---

[9] Mr. Thanos argues that this literal reading of the statute produces an "absurd result" because the court could find adverse impact based on just one instance of officer investigation into prostitution, or just one arrest for prostitution, or just one approach by a person seeking to engage in prostitution. But this concern reflects his conflation of the two parts to the nuisance definition. Adverse impact alone is insufficient to support a judgment of liability: the court still must have made a threshold factual determination that the property is used for prostitution in whole or in part, and—although we do not attempt to pinpoint where that line falls in this case—one investigation or arrest or approach is undoubtedly insufficient evidence to support such a finding.

Furthermore, a trial court is not *required* to find adverse impact solely because one factor is present; the ultimate decision still lies in the court's discretion.

Code § 42-3101 (1)(C). The trial court committed no error in concluding that a prostitution-related nuisance existed on Mr. Thanos's property and that it adversely impacted the community pursuant to the statute.[10]

Lastly, Mr. Thanos states that the permanent injunction should not have been issued because "if there was a nuisance, it had already been abated" and he "had shown no tendency to ignore any Court Order." Mr. Thanos made the same argument below, and we echo the trial court's response: "[T]he record and the Court's Findings of Fact are replete with examples . . . [showing] that defendant Thanos has flagrantly and arrogantly chosen to ignore the law, despite repeated notice that prostitution activities were occurring on his premises. . . . The evidence is overwhelming that [Mr.] Thanos will not abide by the law if left to his own word." These findings are not clearly erroneous and we therefore reject Mr. Thanos's contention that a permanent injunction was unnecessary to abate the

---

[10] Mr. Thanos argues, in the alternative, that if the facts and circumstances of the case do allow for a finding of a "nuisance" with the requisite "adverse impact on the community," then the Act is unenforceable as an unconstitutional taking of Mr. Thanos's property under both substantive and procedural due process pursuant to the Fifth and Fourteenth Amendments to the United States Constitution. This contention has no merit. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1022 (1992) (recognizing "a long line of this Court's cases sustaining against Due Process and Takings Clause challenges the State's use of its 'police powers' to enjoin a property owner from activities akin to public nuisances").

nuisance and prevent its recurrence.  *See Hinton v. Sealander Brokerage Co.*, 917 A.2d 95, 101 (D.C. 2007) (on appeal from a bench trial, "[t]he trial court's findings of fact will not be disturbed unless they are clearly erroneous").

## B.  Attorney's Fees

Pursuant to D.C. Code § 42-3110 (b)(1), which authorizes the assessment of "reasonable attorney fees and costs to the prevailing party," the trial court decided that it was "reasonable to order that the defendants pay the prevailing party's fees and costs in this matter given the ongoing nature of the prostitution-related nuisance, the parties' knowledge of the nuisance, and the distinct lack of efforts on behalf of all defendants to abate the nuisance as the record so amply demonstrates."  Using the well-established *Laffey* matrix,[11] the court awarded the District $76,451.93 against Mr. Thanos.  Absent "a very strong showing of abuse of discretion," we may not set aside the trial court's fee award.  *Steadman v. Steadman*, 514 A.2d 1196, 1200 (D.C. 1986).

_____

[11] *See Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354, 371 (D.D.C. 1983), *rev'd in part on other grounds*, 746 F.2d 4 (1984) (hourly rates for attorneys practicing law in the D.C. metropolitan area could be categorized by years in practice and adjusted yearly for inflation).  The "*Laffey* matrix" is compiled yearly by the Civil Division of the United States Attorney's Office and is regularly used to calculate attorney's fees when there is a statutory entitlement.  *Lively v. Flexible Packaging Ass'n*, 930 A.2d 984, 990 (D.C. 2007).

Mr. Thanos's primary complaint on appeal is that the District should not have been eligible for attorney's fees because it was represented by a Special Assistant Attorney General—a private lawyer acting in a pro bono capacity for the District. Relying on *Link v. District of Columbia*, 650 A.2d 929, 934 (D.C. 1994) (holding that attorney's fees are calculated no differently for nonprofit legal service providers than they are for private attorneys), the trial court awarded the District fees because "[t]he District's Special Counsel was akin to a nonprofit legal service provider." Mr. Thanos contends that the rationale for awarding attorney's fees in *Link* and related cases—that such reimbursement allows for the continued availability of free legal services despite the fact that no fees are actually charged—is absent here. Because the District's pro bono representation was in aid of a "powerful government entity" and the private provider will neither receive the fees nor be "encouraged or enabled" by them, as in the case of free legal services for poor people, Mr. Thanos argues that such fees, as applied here, amount to "punitive . . . back door damages."

In *Link*, we reversed the trial court's decision to award only a token $100 in attorney's fees to Neighborhood Legal Services because that service provider offered representation free of cost and therefore the fees would simply add to the nonprofit's coffers rather than alleviate the client's burden. *Link*, 650 A.2d at 934. We explained our rationale for imposing the fees:

> When free legal services are provided there may be no
> direct barrier to the courtroom door, but if no fees are
> awarded, the burden of the costs is placed on the
> organization providing the services, and it
> correspondingly may decline to bring such suits and
> decide to concentrate its limited resources elsewhere.

*Id*. (internal quotation marks and citations omitted). We disagree with Mr. Thanos that this rationale is inapplicable to the case at bar, where the District and its pro bono assistant brought an action in the public interest to abate a prostitution-related nuisance. That the District is a government entity and not an impoverished citizen is legally irrelevant to the question of attorney's fees. Had the District been represented by a salaried Assistant Attorney General, it would have been entitled to attorney's fees at a reasonable market rate based on the lodestar method ("the number of hours reasonably expended multiplied by a reasonable hourly rate," *Envtl. Def. Fund, Inc. v. Envtl. Prot. Agency*, 672 F.2d 42, 51 (D.C. Cir. 1982)), not based on the attorney's actual salary. D.C. Code § 42-3110 (b)(1) ("Any order issued under this section may include . . . [a]ssessment of reasonable attorney fees and costs to the prevailing party."); *see Neal v. Honeywell, Inc.*, 191 F.3d 827, 833 (7th Cir. 1999) ("The difference between the actual-cost approach and a 'reasonable cost' approach is considerable."). In this case, community-based organizations and government entities alike are empowered to bring nuisance-abatement actions. D.C. Code § 42-3102 (a). Whether the prevailing plaintiff is the U.S. Attorney's Office, the District of Columbia Office of the Attorney

General, or a community-based group, that plaintiff is entitled to reasonable attorney's fees. It would be inconsistent with the holdings in *Link* and *Henderson* to conclude otherwise, and the trial court did not abuse its discretion in assessing reasonable fees and costs against Mr. Thanos despite the unusual nature of the District's representation.

Because we conclude that the attorney's fees awarded against Mr. Thanos were reasonable, we reject the contention that the fees are effectively an award of damages. We also reject Mr. Thanos's argument that the attorney's fees the court awarded against him were too high because the award included the number of hours spent on the District's nonmeritorious claim for damages. In awarding the full amount of fees nonetheless, the court noted, "[e]ven though the Court did not award damages, the Court is awarding all fees and costs because the factual development of the monetary amounts received by the defendants was necessary for an analysis of § 42-3110 (c)(10) when considering injunctive relief." We have recognized that "it is often impossible to distinguish hours spent on individual claims that are ultimately unsuccessful from time spent on the overall successful litigation." *Natural Motion by Sandra, Inc. v. District of Columbia Comm'n on Human Rights*, 726 A.2d 194, 198 (D.C. 1999) (citing *Hensley v. Eckhart*, 461 U.S. 424, 435 (1983)). Therefore, "[t]he fee award should not be reduced simply because the [party] failed to prevail on every contention raised in the lawsuit." *Id.*

(quoting *Hensley*, 461 U.S. at 435). Thus the trial court did not abuse its discretion by awarding the District the full amount of fees it claimed.[12]

## C.    Income Disgorgement

The District cross-appeals the trial court's denial of its request for disgorgement of both Mr. Thanos's and VIP's revenue and income derived from the prostitution-related nuisance.[13] In the Superior Court, the District sought the money Mr. Thanos received from VIP for rent and otherwise, as well as the gross amount VIP received for providing "massages."[14] The District argues that it is entitled to income disgorgement under § 42-3110 (7), the "catch-all provision" of

---

[12] To the extent Mr. Thanos argues that the District should not be entitled to attorney's fees because the District's various actions were procedurally defective, because the court failed to find a nuisance with the requisite "adverse impact," and because the court failed to hold a hearing on the preliminary injunction motion within ten days, we have rejected these arguments.

[13] VIP has appeared as a cross-appellee on this claim.

[14] The District also sought per diem damages in the amount of $100 per day pursuant to D.C. Code § 42-3111, which provides that "the plaintiffs may request, and the court in its discretion may order damages for each day the . . . prostitution-related nuisance is unabated since the defendant first received notice. . . ." The court interpreted the statute to require that per diem damages be compensatory, not punitive. *See* D.C. Code § 42-3113 ("This action is civil in nature and none of its provisions should be interpreted as punishment."). Finding that "[t]here is no evidence in the record as to how the $100 a day is tied to compensating for a specific harm, including the public interest, other than assessing what might be viewed as nominal punitive damages," the court denied the District's request, and the District does not appeal that ruling.

the statute, which provides for "[a]ny other remedy which the court, in its discretion, deems appropriate." D.C. Code § 42-3110 (7). The trial court considered this argument in light of the entire statutory scheme and concluded that it did not have the authority to impose income disgorgement for several reasons: because the Act is focused on abatement and prevention, not punishment or compensation, because a different provision—§ 42-3110 (b)(4)—provides for the capturing of rents for a certain period of time in order to accomplish abatement and specifies when and why rents can be escrowed, and because the D.C. Council made its intentions clear in § 42-3113 that "[t]his action is civil in nature and none of its provisions should be interpreted as punishment." Although the decision to grant or deny equitable relief is committed to the sound discretion of the trial court, *see* D.C. Code § 42-3110 (b), "[j]udicial discretion must . . . be founded upon correct legal principles and a trial court abuses its discretion when it rests its conclusions on incorrect legal standards." *In re J.D.C.*, 594 A.2d 70, 75 (D.C. 1991) (internal citation omitted).

We disagree that the statute does not authorize income disgorgement as a matter of law. While the trial court was correct in concluding that it could not award damages as a legal remedy beyond those authorized in § 42-3111, it does have the broad authority to fashion *equitable* relief for the purposes of enjoining, abating, and preventing the continuation or recurrence of a prostitution-related

nuisance. *See* D.C. Code § 42-3110. Although the District itself referred to income disgorgement as damages in its request, income disgorgement is widely viewed as an equitable remedy.[15] *So v. Suchanek*, 670 F.3d 1304, 1310 (D.C. Cir. 2012) ("Disgorgement is an equitable remedy entrusted to the sound discretion of the district court."); *Cnty. of Essex v. First Union Nat'l Bank*, 891 A.2d 600, 609 (N.J. 2006) ("It is obvious that the County's cause of action for unjust enrichment/disgorgement is an equitable claim."); *King Mountain Condo. Ass'n v. Gundlach*, 425 So.2d 569, 572 (Fla. App. 1982) ("[T]he disgorgement of secret profits . . . is an equitable remedy. . . ."). Instead of compensating victims, as damages do, income disgorgement serves to prevent unjust enrichment. *Cnty. of Essex*, 891 A.2d at 609 (the equitable remedy of disgorgement is "grounded in the theory that a wrongdoer should not profit from its wrongdoing regardless of whether the innocent party suffered any damages"); *United States v. Lane Labs-*

---

[15] VIP argues that the District, having asserted its right to income disgorgement under a theory of damages below, cannot rely on an alternative theory on appeal. *See Estate of Taylor v. Lilienfield*, 744 A.2d 1032, 1035 (D.C. 2000) ("Parties may not assert one theory at trial and another theory on appeal."). But the District specifically cited § 42-3110—dealing exclusively with equitable remedies and not with damages—in its request for income disgorgement. Although the District called the money it was seeking "damages," it plainly sought income disgorgement according to the framework laid out in § 42-3110, analyzing the factors to consider when fashioning a "remedy" under that section. The equitable remedy theory asserted by the District is therefore not novel and is permissible at this stage of litigation.

*USA, Inc.*, 324 F. Supp. 2d 547, 576 (D.N.J. 2004) ("Disgorgement differs from restitution in that it . . . does not turn on compensating the victims."). Under § 42-3110, which relates to equitable remedies (as opposed to § 42-3111, which relates to damages), the court does have the authority to order income disgorgement—not as a punishment or as victim compensation, but to deprive Mr. Thanos and VIP of their ill-gotten revenues on the theory that the cross-appellees should not be permitted to retain the spoils from a prostitution-related nuisance.

The trial court's authority to award disgorgement is not unlimited, however. Disgorgement still must be "necessary" in the specific case at issue to "enjoin[], abat[e], and prevent[] the continuance or recurrence of the nuisance." D.C. Code § 42-3110 (a).[16] Moreover, disgorgement assessed under the Act cannot be punitive in nature. D.C. Code § 42-3113. *See also Sec. & Exch. Comm'n v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978) ("The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing. Any further sum would constitute a penalty assessment."). And, specifically relevant to Mr. Thanos in this case, disgorgement under the catch-all

---

[16] As the trial court recognized, it is not enough to say that "any monetary award will help abate crime because it takes the profit out of the activity." Disgorgement is only "necessary" as a deterrent to prevent a recurring nuisance if there is factual support for a conclusion that the nuisance would recur without disgorgement.

provision in subsection (c)(11) cannot be used to collect rental income from the property—the statute lays out specific procedures for collecting rental income in subsections (c)(4) and (5), and a court cannot use the general catch-all provision to circumvent the Council's explicit instructions. *See Odeniran v. Hanley Wood, LLC*, 985 A.2d 421, 427 (D.C. 2009) ("Although the *expressio unius* maxim . . . must be applied with a considerable measure of caution, it is useful where the context shows that the draftsmen's mention of one thing . . . does really necessarily, or at least reasonably, imply the preclusion of alternatives.") (internal citation and quotation marks omitted).

The trial court noted in a footnote that "on this factual record," disgorgement would have been "more punitive in nature," but that conclusion appears ultimately to have been used to buttress its assertion that it lacked the statutory authority to order disgorgement. Having clarified the scope of the trial court's authority, we remand to the trial court to determine, within its discretion, whether disgorgement is an appropriate equitable—and not punitive—remedy that is "necessary" to enjoin, abate, and prevent the continuance or recurrence of the nuisance under the circumstances of this case.[17]

---

[17] Nothing in this opinion should be construed to suggest that disgorgement is or is not appropriate on the facts of this case.

### III.    Conclusion

For the reasons above, we reverse the trial court's denial of the District's request for income disgorgement and remand for a determination whether such a remedy is appropriate in this case and if so, in what amount.  We affirm the trial court's findings and conclusions on all other grounds.

*So ordered.*