*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-CV-0767

DISTRICT OF COLUMBIA, APPELLANT,

V.

CAPITOL PETROLEUM GROUP, *et al.*, APPELLEES.

Appeal from the Superior Court of the
District of Columbia
(2019-CA-004067-B)

(Hon. Florence Y. Pan, Trial Judge)

(Argued March 16, 2022                                    Decided June 22, 2023)

*Megan D. Browder*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia (at the time of argument), *Loren L. AliKhan*, Solicitor General (at the time of argument), *Caroline S. Van Zile*, Principal Deputy Solicitor General (at the time of argument), and *Carl J. Shifferle*, Deputy Solicitor General (at the time of argument) were on the brief, for appellee.

*Alphonse M. Alfano,* with whom *Jeffrey L. Leiter* was on the brief, for appellees, Capitol Petroleum Group, LLC; DAG Realty, LLC; Eyob Mamo; and L & R Services, Inc.

Before BLACKBURNE-RIGSBY, *Chief Judge*, BECKWITH, *Associate Judge*, and THOMPSON, *Senior Judge*.

BLACKBURNE-RIGSBY, *Chief Judge*: The District of Columbia brought an

action pursuant to the "Drug-, Firearm- and Prostitution-related Nuisance Abatement

Act," D.C. Code § 42-3101, *et seq.* ("Nuisance Abatement Act" or "Act") for a drug-related nuisance at a Shell-branded gas station located at 4700 South Capitol Street, SE ("the property"). The parties stipulated that there was a nuisance on the property within the meaning of the Act, and the trial court held a four-day trial to consider whether the hiring of Special Police Officers ("SPOs") was a necessary and reasonable expenditure that could be ordered to abate the nuisance. However, the trial court did not reach that question because it determined it could not impose that remedy based on its conclusion that there was not a party before it against which it could order relief. The trial court further assessed attorneys' fees against the District of Columbia under a provision of the Act that provides the trial court with the discretion to grant attorneys' fees to the prevailing party. D.C. Code § 42-3110(b)(1).

The District of Columbia appealed these conclusions of the trial court. We reverse and remand for the limited purpose of considering whether the hiring of SPOs is a necessary and reasonable expenditure under the Act. We leave the question whether to hold a hearing on remand for the trial court to consider in the first instance.

## I.     Factual and Procedural Background

Appellee DAG Realty, LLC ("DAG"), a real estate holding company, holds an undivided fee interest in the property at 4700 South Capitol Street, SE.  DAG leases the property to appellee L&R Services, LLC ("L&R"), which operates the gas station and convenience store.  Appellee Capitol Petroleum Group, LLC ("CPG") manages the property on behalf of DAG.  Appellee Eyob Mamo—an individual—is the President of the corporate entity that is the managing member of DAG (DAG Petroleum Suppliers, LLC).  At the time this action was brought, DAG and L&R were in a three-year lease that began on June 1, 2019, and was to end on May 31, 2022.[1]  We refer to DAG, CPG, Mamo, and L&R collectively as appellees where appropriate.

On June 19, 2019, the District brought this action under the Nuisance Abatement Act against appellees; L&R was not initially named as a defendant.  The complaint alleged a drug-related nuisance under D.C. Code § 42-3101(5)(A) & (B) existed at the property based on various drug- and firearm-related incidents at the

---

[1] It is unclear whether, following the termination date of this lease, the parties extended the lease or otherwise entered into a new lease with the materially same terms.  However, our review is limited to the circumstances at the time the action was brought, and so we proceed accordingly.

property between January 2018 and May 2019 that the District contended had an adverse impact on the community that was unabated by the property's owner(s). As relief, the District requested that the appellees be enjoined from creating or maintaining (or assisting to create or maintain) a nuisance property by implementing an appropriate security plan that includes, *inter alia*, "hir[ing] and maintain[ing] security coverage for all operating hours." Between September and October of 2019, DAG voluntarily implemented a majority of the security plan outlined in the District's complaint and directed CPG to perform all of the security measures to abate the nuisance, at a cost of $46,140.20. Of note and concern to the District, CPG did not hire anyone to provide security coverage.

The trial court held a status hearing on November 13, 2019. During that hearing, all parties stipulated that there was a drug-related nuisance at the property and that the trial court could issue an abatement order; however, appellees disputed the scope of the relief that could be granted without development of the factual record about the nuisance. Additionally, the trial court expressed concern about whether it could order CPG, DAG, and Mamo to hire "security guards" if L&R, as the tenant of the property, was not named as a defendant and granted the District's

oral motion to amend the complaint to add L&R as a defendant.[2]  At a subsequent hearing for a preliminary injunction, the District clarified that it was specifically requesting the hiring of "special police officers" (SPOs) which have more expansive authority to operate under D.C. law than "regular" security guards.

When the trial court subsequently ordered the District to further amend the complaint to allege specific claims against L&R, the District filed a praecipe voluntarily dismissing L&R instead.  On March 13, 2020, DAG filed a third-party complaint with the consent of the trial court seeking indemnification and reimbursement from L&R should DAG be found liable.

Thereafter, the District filed a motion for summary judgment on all counts, which the appellees opposed in part.  The trial court granted in part and denied in part the District's motion.  The court granted the motion as to the District's uncontested arguments that: (1) there is a drug-related nuisance on the property; and (2) the drug-related nuisance adversely affects the community.  However, the trial court denied the District's motion on two issues: (1) whether hiring SPOs was a

---

[2] The District filed an amended complaint reflecting this change on December 2, 2019, but without otherwise updating the complaint.

necessary and reasonable solution to abate the nuisance; and (2) if the first question is answered in the affirmative, which party would be responsible for paying.

The parties then proceeded to trial. At trial, the District called three witnesses: (1) Eric Smith, a Sergeant with the Metropolitan Police Department ("MPD"); (2) Olivia Henderson, an Advisory Neighborhood Commissioner; and (3) Frank Sulzer, an expert in the field of security. All three witnesses offered consistent testimony that they witnessed drug-related transactions on the property. Sergeant Smith also testified that MPD maintained a "business beat" covering the property and one other property, which resulted in officers being stationed nearby throughout the day.[3]

---

[3] In his testimony, Sergeant Smith explained that a "business beat" is

> normally a detail where an officer is in the area of, like, a business corridor. So, for example, you have Georgetown, M Street corridor, Wisconsin Avenue Corridor where there's a lot of businesses, a lot of foot traffic. So, typically, like, a business beat there would be on foot, and we would be expected to stay in that area and to be available to those businesses and be visible to those businesses and have a relationship with those businesses in that specific area. . . . In the area of Georgetown, I would estimate [the business beat covered] 15, 20 [businesses].

Sergeant Smith also testified it was "unusual" for a business beat to only cover two businesses, in this case the Shell gas station and the nearby Exxon gas station, because "the business beats are for . . . more well-established business corridor[s]."

During Mr. Sulzer's expert testimony,[4] he testified to his opinion about why MPD's presence at the property was inadequate to abate the nuisance and accordingly, why SPOs were needed. He explained that on his three site visits to the property, he "witnessed what [he] believed to be criminal activity without response from MPD" and that "crime continued to occur regardless of whether MPD was present or not." He testified that he witnessed that when "a law enforcement officer would arrive on property, [the loiterers] would disburse slightly, but they would just stand a little bit off from each other, unless they were out of sight of that law enforcement officer." He also testified that no store clerk would interact with the "loiterers" or attempt to "move them along."

Mr. Sulzer testified that it was his expert opinion that there were "sound, physical countermeasures" on site such as "lighting and cameras and signage" and that the site employed "crime prevention through environmental design" best

---

He further testified that the business beat covering 4700 South Capitol Street was in place because of "the high incidences of drug activity, the high incidences of shooting [sic], the high incidences of firearm recoveries and stuff like that that have happened."

[4] Mr. Sulzer's expert report was admitted into the record.

practices.[5]   However, he testified that those countermeasures had "no functional purpose in deterring crime" without a "capable guardian" able to utilize those countermeasures "as a force multiplier to impact the threat when the threat is identified."[6]

He further testified that it was his opinion that no other option besides armed SPOs would mitigate the crime on the property because armed SPOs could immediately respond to individuals entering the property in the first place as an agent of the business in a proactive manner.  He explained that, on the other hand, there are limitations on policing because police can only respond to crime and police might lack knowledge about which individuals are engaged in criminal conduct.[7]   Mr.

---

[5] Mr. Sulzer's testimony and expert report did not specifically define what this term means.  From context, we gather that it refers to a subset of countermeasures and best practices designed to assist in the prevention and mitigation of threats on a property.

[6] Mr. Sulzer's testimony and expert report did not specifically define what the term "force multiplier" means.  From context, we gather that it refers to a factor that augments the effectiveness of a countermeasure in deterring crime beyond what it would be capable of doing standing alone.

[7] Although we highlight Mr. Sulzer's testimony given its relevance to the purported necessity of the relief the District requested, this should not be read to signal approval of SPOs engaging in conduct police officers themselves cannot legally engage in.  And indeed, SPOs mandated by the District through a suit brought under the Act could be considered state actors who are subject to similar legal limitations as the police. *See, e.g.*, *Limpuangthip v. United States*, 932 A.2d 1137,

Sulzer specifically testified that he believed two SPOs were needed from 2 p.m. until 2 a.m. based on the volume of crime at the property, the past nature and timing of crime at the property, the countermeasures currently in place, and the need for officer safety.

At the end of the District's case-in-chief, appellees moved for judgment "on the ground that on the basis of the facts and the law, [t]he District has not proved by sufficient evidence the elements of its cause of action." Appellees Mamo and CPG primarily argued that the District had failed to establish that they were owners within the meaning of the Act. After hearing argument from the parties, the trial court granted judgment in favor of Mamo and CPG on that issue. Regarding the other grounds on which judgment was sought, the trial court reserved judgment on whether the District failed to establish that their request for $150 per diem damages was compensatory, rather than punitive, and whether D.C. Code § 42-3111 provides

1142-46 (D.C. 2007) (discussing the circumstances under which an SPO can be considered a state actor). In some circumstances, however, SPOs may still be considered necessary to abate a nuisance when they can act more effectively than the police due to certain practical limitations the police may face. As an example, Mr. Sulzer explained that "loiterers" on a property know police will not enforce loitering because they may not know who is loitering rather than being present as a customer of the business, and that "loiterers" know how to stay out of sight of police officers outside of a store by moving around within the store.

the District the ability to seek broad equitable relief. The trial court also reserved judgment on whether the District was required to establish—and if so, whether it had established—that the hiring of SPOs was a reasonable expenditure under the Act.[8]

Appellees proceeded to call four witnesses at trial: Mahat Masood and Liaqat Masood, co-owners of L&R and co-operators of the gas station and convenience store; Erika Dogan, the General Counsel of CPG; and William P. Crowe, the Chief Operating Officer of CPG. The Masoods both testified that L&R's practice was to serve barring notices on loiterers through MPD, and over 100 barring notices were issued, but those barring orders were not generally enforced. Ms. Dogan's testimony consisted of her lay opinion that DAG had limited rights to access the property under its lease with L&R, which does not include the right to require SPOs to be on the property. Finally, Mr. Crowe testified that the annual cost of hiring two SPOs for the requested daily shifts would exceed $218,000 annually, an amount which DAG considered unsustainable relative to the "rents" it collects from L&R. Following the

---

[8] Although the trial court previously held that there was a nuisance at the property at the time the complaint was filed, it reserved judgment on whether there was a continuing nuisance at the property following the abatement measures the appellees undertook after the complaint was filed.

close of evidence, the trial court heard argument on the parties' respective motions for attorneys' fees.

Pertinent to this appeal, the trial court made the following findings.[9] First, crediting the testimony of all of the District's witnesses, the court found an ongoing drug-related nuisance exists at 4700 South Capitol Street that adversely affects the community. Accordingly, the court granted the District the relief of entering an order requiring that the nuisance be abated under the Act.

Second, the court concluded that DAG is an owner within the meaning of the Act. The court also found that L&R Services is an owner of the property within the meaning of the Act as a business entity with title to a leasehold interest in the property; however, it acknowledged that L&R Services was not a party to the litigation as to the District because of the District's prior decision to file a praecipe voluntarily dismissing L&R as a party.

---

[9] The trial court also summarized its prior rulings including, *inter alia*, its grant of CPG and Mamo's oral motion for judgment that they are neither "owners" within the meaning of the Act, nor could they be held liable as owners under a corporate-veil-piercing theory.

Third, the court found that hiring SPOs would abate the drug nuisance. However, the court found it was unable to grant that relief because the District no longer maintained an action against L&R; L&R only remained in the case as a third-party defendant. This distinction was dispositive because the District was not in a position to seek relief directly from L&R, and there was no provision of the lease agreement between DAG and L&R Services "that would permit DAG Realty to post security guards at the property without L&R's consent." The court based its finding on the language of the lease that commits the responsibility of making security improvements to L&R and the absence of provisions specifically authorizing DAG to take such actions on the property.[10]

---

[10] The lease between DAG and L&R provides that "L&R . . . is an independent business with the exclusive right to direct and control the business operation at the property, and DAG . . . reserves no control over the business at [the] property." Furthermore, L&R "shall be solely responsible for making all security improvements at the property, including but not limited to the installation of equipment and fixtures which L&R deems necessary to secure the property against unlawful intrusion, vandalism and criminal activity or to provide for the safety of L&R's employees and customers." The lease also provides, "[i]n the event that L&R desires to make security improvements, L&R shall proceed to do so with the approval of DAG . . . which approval shall not be unreasonably withheld." The trial court "invited the District to point to other provisions of the lease . . . which might allow [it] to order DAG to post SPOs at the property," but the District did not.

Fourth, the trial court concluded that although it agreed SPOs were "necessary" to abate the nuisance, the District failed to establish that the specific recommendation of two SPOs between 2 p.m. and 2 a.m. was "necessary." In consideration of the foregoing, the trial court declined to determine whether the hiring of the SPOs would constitute a "reasonable expenditure" as required by the Act. Further finding that the District failed to establish that any other non-enumerated measures would be appropriate, the court limited the relief granted to requiring DAG to maintain the improvements made on the property and repositioning the already-installed cameras.

Fifth, the trial court awarded attorneys' fees to CPG and Mamo. The trial court concluded that the statutory language granting attorneys' fees to a prevailing party was not limited to only the plaintiff or the District in an action under the Act. The court concluded that it was appropriate to exercise its discretion to grant attorneys' fees to CPG and Mamo because it was unreasonable for the District to proceed against them after the court suggested during the summary judgment hearing that CPG and Mamo were unlikely to be considered owners. However, the trial court concluded it was appropriate to reduce the parties' fees based on their failure to mitigate damages by not moving to dismiss the case or moving for

summary judgment on the question whether they are owners under the Act, and so it only granted them an award of $13,221.50, half of their requested amount.

Finally, the court denied the District's request for attorneys' fees. The court concluded that although the District prevailed "in a narrow sense," the District failed to establish it was entitled to the relief it sought because it failed to sue the proper defendant despite the court putting the District on notice of the issue. Accordingly, the court concluded it was not equitable for the court to grant attorneys' fees to the District. The court further denied the District's request for per diem damages. The court concluded that a daily fine was not "appropriate or equitable" because the appellees voluntarily implemented all of the mitigation measures, other than the hiring of SPOs, requested by the District after the complaint was filed, and it was not "unreasonable for them to do that under the circumstances."

The trial court memorialized in a written order its oral ruling requiring DAG to abate the nuisance at the property. Under the terms of the order, DAG was required to "maintain[] the fencing, signage, and lighting implemented during the court of this litigation" as well as evaluate and adjust the placement of its security cameras as necessary. The court also memorialized its award of $13,221.50 to CPG

and Mamo. The trial court subsequently granted the District's motion to stay judgment pending appeal. The District timely noted this appeal.

## II.    Analysis

The Nuisance Abatement Act was amended in response to "the need for a legal process for shutting down 'crack houses.'" Report on Bill No. 12-519 before the Committee on the Judiciary, Council of the District of Columbia, at 2 (May 13, 1998) ("Committee Report"). The Council recognized that often these properties are owned by "absentee landlords who are reluctant to respond to the neighborhood's protests regarding the tenants' behavior, or the activities of persons who frequent the property." *Id.* Although there were legal routes of action available, they were viewed as "inflexible and obsolete." *Id.* Accordingly, the Act was designed to provide a means, through litigation, of compelling "negligent property owners to take action to curb illegal activity on their property and to preserve the safety of the surrounding neighborhood." *Id.*

The Report further explained that the Act reforms the existing law by providing an alternative to current law, which allows for forfeiture actions against a nuisance property, a process "not always . . . useful . . . in eliminating nuisances."

*Id.* at 7. The Report also recognized that the law permitting action against tenants in a rental unit alleged to be a "drug haven. . . does not address the responsibility of a property owner or housing provider to abate a drug-related nuisance." *Id.* Accordingly, "Bill 12-519 is intended to be more broad in scope, to address situations other than the recovery of rental property." *Id.* Finally, the Report explicitly stated that the Act is designed "to force prompt action to abate nuisances. It is intended to be flexible, so that the Court may fashion a remedy to fit the particular circumstances of a case." *Id.*[11]

With this background, we have previously explained that when the court finds the existence of a nuisance within the meaning of the Act, the court "shall enter an order permanently enjoining, abating, and preventing the continuance or recurrence of the nuisance." *Thanos v. District of Columbia*, 109 A.3d 1084, 1088 (D.C. 2014) (quoting D.C. Code § 42-3110(a)). As a part of its abatement order, the court "may" order a wide spectrum of relief, including, but not limited to, directing the owner of

---

[11] The Report also cited testimony before the committee explaining that "[e]xisting legal remedies for the abatement of nuisance are inadequate" because existing legislation "leaves a judge no flexibility to tailor relief to the specific circumstances of a case. Bill 12-519 provides a comprehensive and flexible scheme." *Id.* at 4-5. The Report cites other testimony similarly describing the Act as "offer[ing] some flexibility when seeking relief from nuisances." *Id.* at 5.

a property to take certain remedial measures, diverting all rental income from the property into escrow or to a trustee, shuttering the property, or any other remedy it deems appropriate. D.C. Code § 42-3110(b). The court is also authorized to grant reasonable attorneys' fees to the prevailing party. § 42-3110(b)(1). Finally, the Act was designed to be "construed liberally in accordance with its remedial purposes." D.C. Code § 42-3113.

## A. Denial of Requirement to Hire SPOs

The trial court concluded that it (1) could not require DAG to hire SPOs because there was no provision of DAG's lease agreement with L&R that would permit DAG to station SPOs on the property and (2) could not grant that relief against L&R because the District could not seek relief directly from L&R. The District, however, contends the trial court was able to grant the relief it sought. We agree with the District.

When a court finds a drug-related nuisance at a property, "the court shall enter an order . . . abating and preventing the continuance or recurrence of the nuisance." D.C. Code § 42-3110(a). Abatement is an "equitable remedy" and the court may grant "declaratory relief or any other relief deemed necessary to accomplish the

purposes of the judgment." *Id.* Among the forms of relief the court may consider are "[o]rdering the owner to make reasonable expenditures upon the property, including the installation of secure locks, hiring private security personnel, increasing lighting in common areas, and using videotaped surveillance of the property and adjacent alleys, sidewalks, or parking lots." D.C. Code § 42-3110(b)(3).

We must first consider whether the trial court was precluded from granting the relief because L&R was only present in the case as a third-party defendant. We conclude the trial court was not. Even if L&R as the entity in possession of the property was in the best position to hire and manage SPOs, and relief would have been more easily granted if L&R were a party to the litigation, we do not read the Act so narrowly. As discussed above, the Council's expressed intent was for the Act to be utilized flexibly. Accordingly, we "construe[] [the Act] liberally in accordance with its remedial purposes," D.C. Code § 42-3113, to authorize the trial court to grant relief against DAG, the undisputed record owner of the property.

Appellees' primary argument against the trial court's authority to order DAG to hire the SPOs is that DAG is not permitted under the terms of its lease with L&R

to place SPOs on the property without L&R's consent.  In support of its contention, appellees cite to provisions of the lease that it believes prevent DAG from hiring SPOs.  Primarily, appellees cite to the provisions that state L&R has the "exclusive right to direct and control the business operation," DAG has a right to access the property which is limited to the access required to make alterations or perform other maintenance of the building, and DAG has the right to access the property "at reasonable times to…verify…compliance with the lease."

While it is true that no provision in the lease explicitly provides DAG with the right to post SPOs on the property, the provisions appellees cite do not compel the conclusion that DAG could not post SPOs on the property.  First, no provision of the lease expressly *precludes* DAG from hiring SPOs for the property.  Second, there is no provision of the lease that states L&R's right to control the business is coextensive with the right to control the *property*.  Third, given the Act's authorization of broad equitable relief, we view the Act as overriding any terms of a lease that would interfere with a trial court's abatement order authorizing necessary relief under the Act.[12]  Notably, paragraph 22 of the lease recognizes that a statute

---

[12] We conclude that L&R, as a third-party defendant, was sufficiently represented in this proceeding such that the imposition of a remedy implicating its rights under its lease with DAG does not violate L&R's due process rights.  To the

such as the Act may override a provision of the lease given its language that "[b]oth parties expressly agree that . . . if any sentence, paragraph, clause or combination of same is in violation of any law, such [provision(s)] shall be inoperative and the remainder of this Lease shall remain binding upon the parties." Therefore, to the extent there may be inconsistencies between DAG's hiring SPOs and what DAG is permitted to do under the lease, we do not view that as relevant to the relief that may be granted. Nor do we view it as relevant whether the relief could be undertaken by L&R to the extent L&R is considered an owner of the property because "[i]n fashioning an order under [the Act], the court shall not consider the lack of action by other property owners[] [or] tenants[.]" D.C. Code § 42-3110(d).

Having concluded that the trial court *could* grant the relief the District requested, i.e., order DAG to hire SPOs, we turn now to the District's argument that the trial court was *required* to grant the relief requested. The District contends that the Act's requirement that the court "shall" enter an abatement order means that the trial court must grant as relief any measures it concludes are necessary to abate the nuisance. The District misinterprets the Act. The Act provides that the court "shall

---

extent that L&R may have a cause of action against DAG resulting from the severance of any provision of the lease, that question is not in the appeal before us.

enter an order permanently. . . abating . . . the nuisance," and the court "may grant declaratory relief or any other relief deemed necessary to accomplish the purposes of the judgment." § 42-3110(a). "[A]s a general rule 'may' connotes latitude or choice — in a word, discretion." *Doe v. Burke*, 133 A.3d 569, 575 (D.C. 2016).

Although it is true that sometimes "may" means "shall" or "must," we have several reasons for believing the Council meant "may" in its ordinary permissive meaning. *See Fraternal Ord. of Police, Metro. Police Dep't Lab. Comm'n v. District of Columbia*, 52 A.3d 822, 827-28 (D.C. 2012) (explaining that although "may" ordinarily has a permissive meaning, "the meaning of the word 'may' in a particular statute depends on the context of the statute, and on whether it is fairly to be presumed that it was the intention of the legislature to confer a discretionary power or to impose an imperative duty" (citation omitted)). First, we have previously explained that the scope of relief to be granted under the Act is "committed to the sound discretion of the trial court." *Thanos*, 109 A.3d at 1093. Second, "when a statutory provision uses both 'shall' and 'may,' it is a fair inference that the writers intended the ordinary distinction." *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016); *Carle v. United States*, 705 A.2d 682, 684 n.3 (D.C. 1998) ("When the same Rule uses both 'may' and 'shall,' the normal inference is that each is used in its usual sense – the one act being permissive, the other

mandatory." (quoting *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947))).  Here, the Council's decision to use "shall" with respect to the abatement order but "may" with respect to the granting of "relief deemed necessary" within the same statutory section is suggestive of a legislative intent to preserve that distinction.  Third, the use of the term "may" preserves the legislative intent that the Act be afforded a degree of flexibility, so that the "Court may fashion a remedy to fit the particular circumstances of a case." *See* Committee Report at 7.  It would unduly constrain the court if the court were compelled to enter any relief deemed necessary even if it had some other justifiable grounds for not granting that relief.  *See, e.g.*, *Thanos*, 109 A.3d at 1094 (explaining that even if disgorgement was necessary, it would be beyond the scope of the trial court's authority to grant that disgorgement if the court determined disgorgement would be punitive in nature).

Given the foregoing considerations, we conclude that the Act uses "may" in its ordinary permissive sense.  Therefore, when the Act provides that the court may grant other relief "deemed necessary," the phrase "deemed necessary" only serves as a qualifier on the trial court's discretion such that the trial court may only grant relief it has deemed necessary; it cannot grant relief it has not deemed necessary. *See, e.g.*, *id.* (discussing whether disgorgement was "necessary" as a predicate

finding to granting relief, not as a finding compelling the entry of disgorgement as relief).

Reviewing the conclusion of the trial court, we note that the trial court "agree[d] that it would [be] necessary and appropriate to have security guards on this property," but the trial court believed it could not order that relief against DAG.  In light of our conclusion that the trial court could have entered such relief against DAG, we reverse and remand for the trial court to consider, within its discretion, whether to enter an abatement order granting such relief.  *See Thanos*, 109 A.3d at 1094-95.  Although we emphasize that the trial court has already found that the hiring of two SPOs to work at the same time was "necessary," we acknowledge that the trial court concluded that the District failed to establish that employing the SPOs between 2 p.m. and 2 a.m. was necessary.  On remand, the trial court should consider whether the District has established that hiring the SPOs for a different duration, or for different hours, was necessary.

The trial court should also consider whether the hiring of SPOs under the circumstances it concludes on remand are necessary would constitute a "reasonable expenditure," a question it previously declined to consider.  In considering this

question on remand, we note that the term "reasonable expenditure" should be read in the context of the other forms of relief contemplated. Many of these measures pose a financial consequence commensurate with an order to hire SPOs. For instance, the Act permits the trial court to "[o]rder[] *all* rental income from the property to be placed into an escrow account with the court . . . until the drug-, firearm-, or prostitution-related nuisance is abated" and "order[] *all* rental income for the property transferred to a trustee . . . who shall be empowered to use the rental income to make reasonable expenditures . . . ." D.C. Code § 42-3110(4)-(5) (emphasis added).

The trial court shall also take into account on remand, based on our conclusion below that Mamo and CPG are owners within the meaning of the Act, whether that impacts the relief granted to abate the nuisance.

## B. Mamo and CPG's Entitlement to Attorneys' Fees

The Nuisance Abatement Act provides that the trial court may "[assess] reasonable attorney fees and costs to the prevailing party." D.C. Code § 42-3110(b)(1). The trial court determined that Mamo and CPG were prevailing parties

because the trial court granted them judgment in their favor and dismissed them from the litigation. "Absent a very strong showing of abuse of discretion, we may not set aside the trial court's fee award." *Thanos*, 109 A.3d at 1091 (internal quotations omitted). However, "[a] court by definition abuses its discretion when it makes an error of law." *Vining v. District of Columbia*, 198 A.3d 738, 745 (D.C. 2018) (internal quotation omitted).

The District raises two challenges related to the trial court's award of attorneys' fees for Mamo and CPG. First, the District contends that the trial court erred in granting Mamo and CPG judgment and dismissing them from the case because they are owners within the meaning of the Act. But for the trial court's grant of judgment, Mamo and CPG would not have been eligible for attorneys' fees as a "prevailing party" in the litigation. Second, the District contends that the entitlement to attorneys' fees under the Act is limited to the District government or community groups authorized to bring suit under the Act. In other words, when the Act says "prevailing *parties*" it means "prevailing *plaintiffs*." Therefore, the District argues, even if the grant of judgment for Mamo and CPG was correct, Mamo and CPG are still not entitled to attorneys' fees as prevailing parties under the Act.

We conclude that the trial court erred in determining that Mamo and CPG were not owners within the meaning of the Act. Accordingly, we reverse the determination that Mamo and CPG were prevailing parties and vacate the associated award of attorneys' fees. Because we reverse the determination that they were prevailing parties, we need not determine whether Mamo and CPG would have been eligible for attorneys' fees under the Act had they prevailed.

As defined by the Act, an owner is "the individual, corporation, partnership, trust association, joint venture, or any other business entity, and the respective agents of such individuals or entities, in whom is vested all or any part of the title to the property alleged to be a drug-, firearm-, or prostitution-related nuisance." D.C. Code § 42-3101(7). In pertinent part, the Act goes on to define the term "property" as "tangible real property, or any interest in real property, including an interest in any leasehold." D.C. Code § 42-3101(8).

The District argues that Mamo and CPG are considered owners under the statutory language quoted above because both Mamo and CPG are agents of the titleholders of the property. The District urges us to interpret the clause "in whom is vested all or any part of the title to the property" as solely modifying the first

clause, "the individual, corporation, partnership, trust association, joint venture, or any other business entity," without also modifying the middle clause, "and the respective agents of such individuals or entities." On the other hand, Mamo and CPG endorse the trial court's conclusion that the definition of "owner" only encompasses agents that also hold title to the property, whether it is title to the real property such as DAG, or title to a leasehold interest such as L&R. Under their proposed construction, the third clause, "in whom is vested all or any part of the title to the property," would modify *both* of the preceding clauses.

"The first step in statutory interpretation is to determine if the language is plain and admits of no more than one meaning." *Price v. Bd. of Ethics & Gov't Accountability*, 284 A.3d 1019, 1024 (D.C. 2022) (quotation marks omitted). However, the court will look beyond plain meaning "in order to effectuate the legislative purposes, as determined by a reading of the legislative history or by an examination of the statute as a whole." *Id.* (cleaned up). Here, although the definition of "owner" may be susceptible to either alternative construction proposed by the parties, as explained below, not only is the District's proposed construction the more reasonable one, but it is the one most consistent with the statute's remedial purpose.

We are guided by the Act's mandate that it "shall be construed liberally in accordance with its remedial purposes." D.C. Code § 45-3113. Reviewing the legislative history of the Act, the Committee Report explains that the purpose of the Act was to "hold property owners accountable." Committee Report at 7. The Committee Report explains that the Act was put forth against the background of other nuisance-related legislation that already authorized actions against owners and tenants, but limited the available relief to the seizure of property and eviction, respectively. *Id.* Accordingly, the Nuisance Abatement Act was designed "to be flexible, so that the Court may fashion a remedy to fit the particular circumstances of a case." *Id.* Construing the Act in a manner consistent with the District's interpretation, we believe, is consistent with the remedial purpose of the legislation. By allowing courts to order relief against agents of owners, and not just the owners directly, the Act provides the necessary flexibility to address circumstances, such as those presented here, where non-titleholders are relevant actors in a position to effectuate the court's abatement order.

Appellees express a concern that the absence of a limiting principle concerning the word "agent" means that all types of agents could be held liable.

However, appellees do not contest the District's contention that Mamo and CPG are general agents of the titleholder, DAG, and so the question we are presented with here is solely whether *general* agents (such as Mamo and CPG) fall within the Act's broad definition of who constitutes an "owner." Having concluded that they do, we do not decide whether other types of agents, who may engage in conduct contributing to the creation of a nuisance on the property, could fall within the Act's definition of an "owner."

The District provides an alternate argument that Mamo and CPG would still be proper defendants under the Act because the Act provides a cause of action against "any person." *See* D.C. Code § 42-3102(b) ("Such actions shall be commenced by the filing of a complaint . . . against any person . . . ."). We do not decide this question in light of our prior conclusion that Mamo and CPG are owners within the meaning of the Act.

Because we conclude that Mamo and CPG are owners within the meaning of the Act, we reverse the trial court's grant of judgment to Mamo and CPG on this issue. Consequently, Mamo and CPG cannot still be considered "prevailing parties" on that issue within the meaning of the Act's attorneys' fees provision. *See* D.C.

Code § 42-3110(b)(1) (allowing the trial court to "[assess] reasonable attorney fees and costs to the prevailing party"). Therefore, we vacate the trial court's grant of attorneys' fees to Mamo and CPG. *Vining*, 198 A.3d at 755 (reversing an award of attorneys' fees when the trial court committed an error of law).

## III.   Conclusion

For the reasons set forth above, we reverse the trial court's conclusions that Mamo and CPG were not owners under the Act and vacate its award of attorneys' fees for Mamo and CPG. Further, we reverse the trial court's conclusion that it could not require DAG to hire SPOs on the property and remand for proceedings consistent with this opinion to determine the scope of relief that should be granted. We leave the question whether to hold a hearing on remand for the trial court to consider in the first instance.

*So ordered.*